651 A.2d 186

PENNSYLVANIA HUMAN RELATIONS
COMMISSION, Petitioner,

v.

SCHOOL DISTRICT OF PHILADELPHIA, Respondent,

and

Harry and Annemarie Gwynne, ASPIRA
of Pennsylvania, et al., Intervenors.

Commonwealth Court of Pennsylvania.

Decided Nov. 28, 1994.

Michael Hardiman, Asst. Chief Counsel, for petitioner.

William H. Brown, III, for respondent.

Michael Churchill and Patricia A. Lowe, for intervenors.

SMITH, Judge.

Hearings were held on the educational plan filed on September 15, 1994 by the Court-appointed Educational Team which recommended ways to remedy the racial disparities in educational opportunity and academic achievement and to enhance voluntary desegregation in the Philadelphia public schools. The educational plan was developed by a seven-member group of educational experts pursuant to the Court's opinion and order filed in *Pennsylvania Human Relations Commission v. School Dist. of Philadelphia,* 161 Pa.Commonwealth Ct. 658, 638 A.2d 304 (1994). The Educational Team conducted research, compiled and analyzed School District data, engaged in public factfinding, and after several months of activity, designed a plan for review and consideration by the Court.

## A.

The Court heard testimony from the Educational Team Chairperson who served as facilitator in the preparation of the educational plan and presented an overview of the Educational Team's work, and testimony from various witnesses for the parties to support their respective responses to the educational plan. The Court was persuaded by the testimony of Dr. Susan Virginia Bredekamp, an expert in early childhood development called by ASPIRA. Dr. Bredekamp reiterated testimony offered throughout these proceedings that all children are capable of learning at high levels, given the opportunity to do so, and research has shown that smaller class size produces significant achievement gains for minority students.

Superintendent of Schools, Mr. David Hornbeck, presented persuasive and cogent arguments to support his proposal to reform the educational process within the School District of Philadelphia and explained how he intends to go about this process through a 10–point "Children Achieving" agenda. He stated that high academic standards must be the benchmark for reform and, as the Court agrees, Philadelphia may very well become a national model in improving the academic

achievement of students in a large urban area. The Superintendent believes that his 10–point agenda must be implemented in its entirety if Philadelphia public school students are to achieve at high levels. The agenda, however, has not been implemented in any other school district.

Dr. Margaret Doss Willis, Director of the Southwest Center for Educational Equity funded by the U.S. Department of Education, testified as the School District's expert in the area of urban education and education equity as it relates to the achievement of minority and poor children. She testified that urban school districts tend to work in a vacuum rather than calling upon available outside assistance and that to reduce racial disparities in academic achievement, any reform effort should include challenging instruction for minority students, parental involvement in the schools, and smaller class size. Dr. Willis stated that she has collected no data which demonstrates that academic achievement of students improved as a result of school-based governance.

Various educational reports and studies [1] suggest that decentralization and the corresponding transfer of school governance to school-based management produce little or no discernible positive effects on student achievement. School-based management traditionally has organizational structure and school empowerment as its center; however, despite the absence of data conclusively showing improvement in academic achievement, studies document the increased autonomy of parents, teachers and principals which enhance school environment.

The Court has examined in part recent education legislation signed into law by the President signaling a strong message for reinvesting in public school education where the focus is on high academic achievement of all students. The Improving America's Schools Act of October 20, 1994, Pub.L. No. 103–

1. U.S. Department of Education, Report on School–Based Management—The Changing Focus of Control in American Public Education, February 1994; Summers & Johnson, Review of Evidence on the Effects of School–Based Management Plans, University of Pennsylvania, August 1994 (study discusses decentralization process sweeping the nation in school reform).

382, promotes high quality educational opportunity for all children and authorizes, inter alia, additional federal funds to approved school districts which develop creative new magnet programs or substantially revised magnet programs for students at all academic levels. The magnet assistance program dispels the notion that magnet programs "skim off" only the highest achieving students and supports the selection of students by processes other than academic testing. The Act specifically recognizes the dual purpose of magnet programs as an effective means for improving academic achievement and for the desegregation of students of all racial backgrounds.[2]

## B.

The Court has thoroughly reviewed testimony offered by the parties as well as the educational plan and written public responses to the plan. Those responses represented, among others, the views of parents, teachers, business leaders, community and civic workers, one member of City Council, the Philadelphia Federation of Teachers (PFT), and various other unions which support the PFT's position. Further, the Court has also studied reports of decentralization and restructuring efforts in Chicago, New York, and Kentucky which have instituted educational measures containing features incorporated throughout the educational plan. Finally, the Court conducted site visits to elementary, middle and high schools within the regions in an effort to glean greater insight into the gravity of the issues before the Court.

**2.** The School District should be guided by other significant federal legislation or directive in developing and implementing its educational reform efforts. The Goals 2000: Educate America Act of March 31, 1994, Pub.L. No. 103–227, and the School–To–Work Opportunities Act of May 4, 1994, Pub.L. No. 103–239, promote the goal of students achieving at high levels and offer educational and student job training goals for school districts to reach. See also Human Services Amendments of 1994, Pub.L. No. 103–252. On October 22, 1994, the President issued a directive to the U.S. Department of Education requiring school districts to expel students for up to one year if caught in school in possession of a weapon, and the failure of a school district to act may result in the loss of federal funds.

While educational experts have provided invaluable assistance throughout these proceedings, the views expressed by students, parents, teachers and principals and written public comment are just as valuable and compelling in fashioning an appropriate order in this case. Without a willingness on their part to assume responsibility and obligations to make educational reform a success, all else pales in significance. Likewise, no amount of reform strategies or additional financial resources can effectively alter the status quo unless those persons central to the reform effort are committed to making it work.

Moreover, the results of a thirty-year study by the U.S. Department of Education and other reports reinforce the response of many that the initial and immediate focus in school reform should be on school safety and student discipline, parental involvement, and teaching students strong basic educational skills if they are to succeed.[3] Thus incorporated into the following order is the Court's decision to remain committed to educational reform strategies that have been proven successful in the past and shown to produce permanent and lasting effects on student achievement and progress. Proven educational strategies have been too long denied Black and Hispanic students in racially isolated schools.[4]

**3.** Strong Families, Strong Schools, Report of U.S. Department of Education, September 1994; First Things First, What Americans Expect From Public Schools, Report from the Public Agenda Foundation, New York, N.Y., October 1994; Putting Learning First, Committee for Economic Development, New York, N.Y., 1994.

**4.** The School District has filed a motion to join the Commonwealth of Pennsylvania and Governor Robert E. Casey, and ASPIRA has filed a motion to join the Commonwealth of Pennsylvania and the City of Philadelphia in this action pursuant to Pa.R.C.P. 2232(c). The School District's liability for compliance with the Court's order is not, however, conditioned upon a joinder of the Commonwealth or the City which can be sued in a separate funding action. *Pennsylvania Human Relations Commission v. School Dist. of Philadelphia (HRC V)*, 167 Pa.Commonwealth Ct. 1, 651 A.2d 177 (1993), *aff'd*, 161 Pa.Cmwlth. 658, 638 A.2d 304 (1994)). Nevertheless, because extensive evidence of racial disparity has been fully documented and the issue of financial ability to remedy the disparity has been again raised, for the sake of judicial economy the Court will permit the parties to renew their motions for joinder after the School District has submitted an approved educational

After weighing the evidence and information presented throughout these proceedings, the Court enters the following order pursuant to its February 4, 1994 opinion and order compelling the School District to provide equal educational opportunity and educational quality to all students and to expand the voluntary desegregation of the schools. The Court's order shall incorporate the student, parent, teacher and principal as central participants in the educational reform effort, high academic standards and elimination of racial disparities in academic achievement as the primary missions, and rigorous curriculum framework as its core.

The order shall set forth specific requirements to be met by the School District while simultaneously affording latitude and flexibility to the District to devise an effective plan for submission to the Court. To the extent modified or otherwise indicated, the Court adopts the educational plan recommendations for Teaching and Learning/Professional Development; Desegregation and Educational Improvement; Resources, in part; School Climate, Safety and Discipline; Organizational Restructuring, Accountability and Facilities, in part; and Monitoring. The specifics contained in the recommendations accepted by the Court may serve as a blueprint for the School District's plan to be submitted to the Court.

**IT IS NOW THEREFORE ORDERED** that the School District shall develop and submit to the Court no later than February 15, 1995 a plan that addresses the following components and provides timetables for implementation:

### Parental Involvement

1. The School District shall immediately develop creative outreach strategies for each school to implement, where neces-

plan and undergone an independent performance and financial audit to identify economies and all funds available to pay realistic cost projections for implementation of the Court's order. The School District's Exhibit PPP will require extensive revision to develop a rational and thorough cost analysis, particularly as to professional development costs, pre-school, kindergarten and reduced class size projections, debt service for new construction which fails to reflect an analysis of existing facilities under-utilization, and lack of foundation for a $91.6 million voluntary mentor/monitoring program.

sary, to convince parents of school students of the critical need for their direct participation in the education of their children. The School District shall direct these strategies initially toward racially isolated schools where students' parents shall be encouraged to become regular partners with their childrens' teachers, to serve as parent classroom representatives, to develop ways to help their children to meet high academic standards, and to serve as classroom and school volunteers. These parents may serve as a core for the local school councils referred to below under organizational restructuring.

*Teaching and Learning/Professional Development*

2. The School District shall develop:

a. Clear educational standards for curricula based on national exemplary standards defining what students should learn and what teachers should teach to improve academic achievement of students. Curricula standards shall be developed with priority emphasis on teaching strong foundations in English, writing and math skills in addition to other core academic subjects;

b. Content and performance standards for student achievement which shall characterize the knowledge and competency required for successful transition to higher education or job training and employment; intermediate achievement expectations at specific points in elementary and secondary schools; specific academic achievement goals for students in racially isolated schools; and

c. Development of a process for assessing whether students have met culminating and intermediate achievement standards and the disparities between current and best practices and between existing and desired student learning outcomes.

3. The School District shall provide an effective program of professional development which responds to the new performance standards and curricula framework and the District-wide assessment of professional development needs, and the School District shall include plans for the deployment of staff for training purposes and for utilizing the expertise of teach-

ers and principals employed within the School District. The program shall be designed, inter alia, to change teacher attitudes toward and expectations of students in racially isolated schools, demonstrate that these students can learn at high levels if given the rigorous training and opportunity to do so, and to develop skills in encouraging parental involvement in the schools.

4. The School District and PFT shall join together in urging institutions of higher education within the Commonwealth of Pennsylvania to provide mandatory courses for education majors in teaching multi-racial classrooms in urban school districts and methods to promote parental involvement in the schools.

5. The School District shall develop the necessary plans to provide full-day kindergarten by September 1995 to all at risk children eligible to attend the racially isolated schools and shall provide by September 1996 an opportunity for all eligible children throughout the District to attend a developmentally appropriate full-day kindergarten class.

6. The School District shall develop a plan to reduce the average class size for kindergarten through third grade to one teacher and one aide for twenty students beginning with the racially isolated schools, and shall reduce average class size from the current class size ratios for the remaining grades four through twelve. The School District shall not prevent individual schools from altering the class size goals based upon appropriate and necessary deployment of instructional resources and needs of the students for individual attention and training. The School District shall provide, to the extent feasible, classroom aides through a collaborative effort with colleges and universities and classroom assistants funded by federal and/or state agencies.

7. The School District shall develop plans to enlist public agencies, colleges and universities, private institutions and community organizations in a collaborative effort with the School District to create developmentally appropriate pre-school programs including Head Start and parent cooperative

programs to accommodate all eligible children, focusing initially on racially isolated schools.

8. The School District shall also request city, state and federal agencies to assist in the development of community schools giving priority to racially isolated schools for after-school and weekend tutorial programs; summer school remedial, course credit or enrichment programs; health care services; drug and alcohol and other prevention programs; literacy classes; adult education classes; recreation and other programs aimed at promoting the development and academic achievement of students.

9. The School District shall evaluate its bilingual education program for Hispanic students and develop a plan for reducing academic disparities and improving achievement.

10. The School District shall determine whether its special education programs are in compliance with all applicable laws and whether the criteria for placement and the racial enrollment in these programs discriminate against Black and Hispanic students. The School District shall formulate plans which will ensure that special education students receive proper educational training, regular evaluation to determine their eligibility for mainstreaming, professional training for special education teachers and staff.

### Educational Improvement

11. The School District shall develop effective strategies for coordinating work and higher education readiness standards which reflect how the School District proposes to collaborate with area colleges and universities, businesses, trade and municipal unions, and community-based organizations to implement school-to-work and school-to-higher-education programs. The plan shall detail how the School District will expand its career academies and magnet programs and themes to promote the programs, and how the School District will afford school-to-work and school-to-higher-education opportunities to Black and Hispanic students.

12. After establishing clear academic standards and curriculum framework, the School District shall require each school to conduct a self-study which, in accordance with the new standards and curriculum framework, shall address each school's instructional programs; student achievement levels; need for remedial reading and math instruction; professional training needs; student promotion and assignment policies; parent and community involvement; school climate and safety; facilities needs; and any other appropriate components.

13. To eliminate educationally disruptive weeks and/or months at the beginning of each school year, the School District must provide proper school allotments which reduce the requirement for class leveling at the beginning of each school year. Student scheduling and teacher assignments shall be processed and completed in each school year no later than the first full week of school beginning September 1995, and every school shall have at the beginning of each school year text books and materials, computers and other equipment necessary for teachers to effectively teach their classes and for students to properly learn and to perform at grade level.

14. The School District shall eliminate the practice of assigning non-certified substitute teachers to classes in racially isolated schools; offer incentives and take whatever steps are available to develop a core of experienced retired teachers willing to serve as substitutes in racially isolated schools; avoid the practice of assigning multiple substitutes to classrooms in racially isolated schools; and design ways to attract and to assign a greater percentage of experienced and qualified teachers to serve in racially isolated schools.

### Desegregation Strategies

15. The School District shall expand its desegregation efforts by evaluating existing magnet and other academic enrichment programs and current voluntary desegregation levels and revising where appropriate to cause on an equitable basis a greater percentage of Black and Hispanic students afforded magnet and academic enrichment opportunities; by maintaining the existing magnet programs and schools and other voluntary desegregation efforts and designing new and

creative magnet programs and schools to attract students of all racial backgrounds; and implementing new magnet, exemplary and academic enrichment learning programs and practices in racially isolated schools to provide students with more rigorous and academically challenging course work necessary to excel.

16. The School District shall abolish its desegregation office and establish an Equity Assurance Office, referred to below under organizational restructuring, which shall provide information to parents and students about desegregation opportunities within the School District, develop steps which simplify procedures and expand voluntary transfers for desegregation purposes, and ensure equity in the provision of educational opportunities to all students.

17. The School District shall develop all other feasible methods for further voluntary desegregation of students through changes in school feeder patterns; design of school clusters, if any, which incorporate desegregation strategies and prevent further segregation of students in poor and racially isolated areas; construction of new school facilities and renovation of existing property centrally located and accessible to students of all racial backgrounds; and development of a plan to address how children in racially isolated schools will be involved in culturally diverse educational and social experiences and how the District shall continue to address the promises contained in the 1983 Memorandum of Understanding pertaining to the voluntary desegregation of schools.

### Resources

18. The School District shall apply for all local, state, federal and private grants for which the School District may be eligible and shall develop a plan to assist individual schools in identifying and applying for available grants to their schools. The School District shall submit in its plan a list of all grants applied for or to be applied for in 1994–1995 and in 1995–1996 and shall maintain a grants office to continuously pursue all available federal and state program funds. The School District shall also seek technical assistance from the

U.S. Department of Education, Department of Housing and Urban Development, and other federal and state agencies in matters related to the reform effort, including parental and family involvement, eradicating student violence and vandalism, and professional development.

19. The School District shall secure an independent performance and financial audit of its operations and expenditures and shall cause School District personnel to cooperate with that study. The audit is to determine economies and the amount of funds available to finance the instructional and other improvements necessary to end racial achievement disparities within the School District and to improve the quality of education available to all students.

20. The School District shall submit a letter report to the Court by December 9, 1994 indicating the audit completion date, the identity and expertise of those conducting the audit, focus and scope of the audit, whether the audit will include a full review of the allocation of resources, whether it will determine reductions in central and regional administrative staff positions, follow-up on prior audit findings and recommendations, review of school board member expenditures and all other major functions and expense categories including facilities under-utilization, energy costs and vehicular use, and a review of other cost savings and increased revenue. The Court retains the option to order an independent audit by an outside accounting firm experienced in urban school audits with all audit fees to be payable by the District.

21. The educational plan recommendations 12 and 15 under the heading "Resources" are conditioned upon the results of a performance and financial audit of the School District and the preparation of realistic and reasonable cost projections for implementation of the plan. The Court rejects the recommendation or any plan to shift school budget funds to local councils to bank and to pay vendors and contractors directly. The release of potentially millions of school budget dollars to local school councils raises indeterminable financial and auditing control questions and more specifically, has not been shown to positively impact upon student academic achievement.

*School Climate, Safety and Discipline*

22. The School District must provide a school climate in which teachers can effectively teach and students can properly learn. The School District shall identify the range of programs and resources which individual schools may utilize to eliminate violence, vandalism and graffiti, and classroom disruption and shall set forth a course of action to remove persistently or habitually disruptive and violent students from the schools.

23. The School District shall collaborate with social service agencies, parent volunteers, juvenile justice authorities, and law enforcement agencies to eliminate school violence and disruption and shall request Juvenile Court to assign probation officers to individual schools where needed to monitor students under the court's jurisdiction. The School District must involve students' parents in eliminating school violence and disruption, initiate exemplary programs such as Project Parent Involvement, and enlist parents and people in the community to also provide safe corridors in and around the schools.

24. The School District shall develop and maintain a system-wide code of student conduct to be enforced by the schools promptly and in a nondiscriminatory manner. The conduct code shall include provisions for in-house suspension or accommodation rooms for students requiring temporary removal from the classroom for disciplinary purposes; clearly define for immediate implementation student conflict resolution and peer mediation programs, with special emphasis on middle and high schools; and a plan to enlist civic, community, and other groups to develop a voluntary student mentor program.

25. The School District shall create alternative schools in each region for students who require extensive counselling and/or supportive services not available at the schools. Alternative schools shall not be viewed as substitute placement for students whose disruptive behavior can be resolved through in-house suspension or accommodation, and placements to

alternative schools will not be utilized to discriminate against any particular class or race of students.

26. The School District shall determine the schools which experience the highest rates of absenteeism, truancy and dropout during the current, and past, school year and shall assign sufficient home and school visitors to combat the alarming rates of absenteeism, truancy and dropout within the School District.

27. The School District shall institute a system-wide voluntary dress code for adoption by elementary, middle and high schools to promote an orderly and disciplined school environment. The policy shall be consistent with limitations imposed by the State Board of Education and may become mandatory where student attire causes disruption of the educational process or health or safety concerns.

### Organizational Restructuring

28. The School District shall restructure its organizational operations in order to improve the academic achievement of students and to meet the new curricula standards; to foster decision making at the school level by teachers, principals and parents; and to streamline and reorganize the administrative and operational functions to provide efficient and effective support to the individual schools. This shall be facilitated in part by the establishment of one **Local School Council,** or other appropriate designation, for each school comprised of the principal, teachers, school staff, parents and community members who will participate in standard-setting and curriculum development processes consonant with the School District's curriculum framework. A **City–Wide Council Assembly** may be established and made up of representatives from each local council, and the council assembly may elect an **Executive Committee** to consult with the Superintendent and Board of Education on matters affecting student achievement and school governance.

29. The School District shall abolish its desegregation office and institute an **Equity Assurance Office** whose primary responsibility shall be to monitor District efforts to

secure equity for all students and staff, monitor and expand voluntary desegregation efforts, and make recommendations to the school board and superintendent. As well, the District shall develop a **Professional Development Center** responsible for professional development of staff, development of a principal's training academy, and for training of parents and local school council members in school governance matters; and shall establish a **Student Recruitment and Educational Counselling Office** as a function of the Equity Assurance Office to ensure that students and their families receive information about all available educational options. The School District shall engage the services of an independent organizational design consultant to assist in the restructuring process.

30. A blueprint for the School District's design for school governance is contained in the June 1990 school-based management memorandum between the School District and the PFT. The design shall not include the authority to hire or fire staff because this function is delegated to the School Board by virtue of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§ 11–1127–1132, 21–2103, 2108 et seq. The design shall, however, provide a mechanism for local school councils to make personnel recommendations to the School District, and to develop and adopt school budgets based upon school needs and allocations and to determine the distribution of financial aid and personnel resources consistent with statutory school budgeting functions reposed in the Board of Education. The design for local school governance shall not include the transfer of school budget funds to the local school councils on a pilot basis or otherwise, as indicated in paragraph 21. All approved budget items shall be processed for payment through the School District's central finance office.

31. The School District's plan shall contain a timetable for implementation of restructuring, including but not limited to selection, training and development of staff, parents and others who will participate in local school governance, necessary alterations in grade configurations to develop consistency in instructional practices, guidelines for lengthening the school

day and school year, and appropriate changes in budget format for public reporting purposes. The plan shall also include the proposed formula for school resource allocations which is needs based and ensures equity in the allocation of resources to racially isolated schools.

32. The educational plan lacks a substantial or competent basis for recommendation no. 21 to eliminate regional superintendents and also fails to provide, as did the School District, an effective or reasonable alternative to a structure which has not been shown to be dysfunctional. Recommendation 21 is therefore rejected. Due to the vast number of schools and students within the School District, an organizational structure must exist to supervise school-based management efforts, to carry out system-wide policies within each region, to provide community support to schools and parents, to perform all functions necessary to ensure that central office services are effectively utilized by the schools and school-based management effectively implemented, and to avoid the potential for 257 separate and independent school operations.

### Accountability

33. The School District shall develop a proposal, including timetable, for monitoring of the School District's progress in improving the quality and equity of the education it provides. The proposal shall provide for external as well as internal evaluation of the teaching and learning in each school; demonstrated effectiveness of the professional development effort; and effectiveness of the school governance structure relative to improvement of instruction and academic achievement of students.

34. The School District shall establish a system of accountability based on measures of student performance and achievement by developing appropriate assessment standards, and by developing and implementing an incentive system of graduated rewards and sanctions for teachers and administrators and students.

35. The School District shall further develop as part of the school improvement and assessment process a program for

periodic reviews of each school covering instructional and other practices to be conducted by internal and external evaluation, and shall develop a process for annual public reporting of student achievement data by school and other indicators of school performance.

36. The Court will not require the School District to develop the multiple layers of evaluation committees, teams, consultants and accountability council recommended in the educational plan. It is enough if the School District has an effective internal and external accountability system which accurately evaluates the School District's performance.

### Facilities

37. The School District shall develop a plan to identify, prioritize and complete repairs required in each school. The plan shall evaluate the adequacy of maintenance staffing and accountability systems, and address how individual schools will participate in setting priorities for repairs and facilitate the repair and maintenance process at the school level.

38. The School District shall also evaluate the current method for deciding repair priorities and develop in conjunction with maintenance staff representatives a plan for the timely processing of repair orders and a program for resolving the unacceptable maintenance calls due to student graffiti and other vandalism. The plan shall also provide a method for reporting on the status of the School District's facilities in its public reports.

39. The School District shall properly maintain, clean and repair school buildings and facilities and shall conduct an immediate facilities assessment of the racially isolated schools to determine repairs and maintenance needed and a timetable for completion giving priority to these schools. A plan shall be designed to institute a program of maintenance and repair of racially isolated schools and shall include prompt and proper repair of leaking roofs, restroom facilities, broken windows, and heating systems. The School District shall secure the assistance and services of parents and the commu-

nity to embark upon a program of cooperation in facilities repair and maintenance.

## Overcrowding

40. The School District shall address school overcrowding and shall develop a plan which includes timetables for new building construction, additions, and renovation of existing school facilities. The School District shall detail how it will evaluate existing building capacity to determine the need for new facilities, their location, and impact on the expansion of voluntary desegregation opportunities.

## Reporting and Monitoring

41. The School District shall develop a proposal for reporting to the Court and to the parties on the School District's adherence to and progress under its reform agenda. The reporting proposal shall identify the data and information which will allow the School District, the Court and the parties to assess the quality and effectiveness of reform efforts and to identify racial disparities which require correction.

42. The reporting proposal shall include a bi-annual reporting timetable for 1994–1995, 1995–1996, and 1996–1997, and thereafter annual reporting, and shall identify the staff and/or office responsible for satisfying each aspect of the reporting plan. The first bi-annual report is due July 3, 1995, and the School District shall demonstrate, beginning with the 1996–1997 school year if not sooner, reductions in the racial disparities in academic achievement of its students

43. The Court shall conduct its independent monitoring of the School District's implementation of its plan and shall appoint a three-member body to serve as the Court monitoring committee to review and evaluate the School District's plan to be submitted by February 15, 1995. The committee shall review the periodic reports submitted to the Court by the School District, and regularly consult with the Superintendent and other appropriate School District personnel to evaluate the implementation process. The Court monitoring committee shall make periodic reports to the Court containing an evaluation of the implementation progress and appropriate

recommendations for changes required to ensure compliance with the order.

44. The Court shall appoint a seven-member advisory committee to the Court monitors. The advisory committee will include a representative selected by the Human Relations Commission and each of the Intervenors, and educational, business and community representatives. The U.S. Department of Education, Office of the Regional Representative, has consented to participate in the monitoring process and shall serve in an advisory capacity as needed.

45. Pursuant to prior decisions of this Court, the Human Relations Commission has the ultimate responsibility for monitoring the School District's implementation of an approved plan and shall continue in its monitoring role to ensure the School District's compliance with the law.

46. The Court shall retain jurisdiction in this matter until evidence is presented to demonstrate compliance with the Court's order.