**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Petitioner,**

v.

**SCHOOL DISTRICT OF PHILADELPHIA, Respondent,**

and

**Harry and Annemarie Gwynne, Aspira of Pennsylvania, Intervenors.**

Commonwealth Court of Pennsylvania.

April 27, 1995.

Michael Hardiman, Asst. Chief Counsel, for petitioner.

William H. Brown, III, for respondent.

Michael Churchill and Patricia A. Lowe, for intervenors.

SMITH, Judge:

This opinion and order concern the Court's review of the Reform Plan filed by the School District of Philadelphia on February 15, 1995 in accordance with the Court's opinion and order dated November 28, 1994. The Court required the School District to develop a plan to eliminate racial disparities in academic achievement and educational opportunities within the school system. The Court conducted hearings on the Reform Plan on March 21, March 23 and April 7, 1995, receiving testimony from the School District Superintendent, Mr. David Hornbeck, the Assistant Superintendent for the Office of Collaborative Programs and Development, Ms. Katherine Connor, and the President of the Philadelphia Federation of Teachers (PFT), Mr. Theodore Kirsh.

### I.

The Superintendent testified about elements of the Reform Plan and of the Action Design, which offers a more detailed descrip-

---

tion of the proposed educational reforms. Through the use primarily of Educators' Committees comprised of teachers and principals, Mr. Hornbeck proposes to establish an "educator driven" process to develop performance standards for Philadelphia schools commencing Spring 1995. He recognized that these professionals have the "bottom-line" responsibility to educate students and that they must be a part of the standards process. Mr. Hornbeck further testified concerning the development of school clusters and stated that specific cluster plans are still in progress. He concluded that only one school council is necessary for each school building, described the proposed organizational structure, and noted plans for increasing parental involvement within the schools.

Mr. Hornbeck persuaded the Court that the School District's plans for class leveling at the beginning of the school year are realistic and reasonable, and he presented various strategies for educational reform that are rational and necessary to challenge the public school system. The school cluster concept is no doubt a good one so long as it does not have the effect of increasing the racial isolation of students and the School District more fully and clearly defines the clusters and demonstrates that their dominant focus will be on increasing academic achievement of students.

Ms. Connor testified about the task assigned to her and Dr. Ernestine Carter, Director of the Desegregation Office, to study and evaluate existing magnet programs and desegregation strategies in order to devise a report for submission to the Court by June 30, 1995. The Report shall respond to requirements of the November 1994 order for the School District to expand magnet programs, educational enrichment opportunities for students attending racially isolated schools, and voluntary desegregation strategies to increase physical desegregation opportunities within the School District.

Mr. Kirsh testified at length about issues confronting the School District and discussed some of the Union's major concerns about

school safety and security, school climate, the failure of the School District to provide basic allotments or resources to the schools, and potential cuts in early childhood programs.[1] He does not support the plan to pay teachers approximately $130 million in rewards over a three-year period to do their job of educating students—his position is fully endorsed by the Court. Mr. Kirsh recommends instead that available funds be deployed to restore programs to the schools. He explained the first-time, "pro-active" response of the PFT to educational reform and its agreement with the School District to assume responsibility for improving the "Quest Schools," those designated as the most in need of additional rehabilitative support and resources. The improvement of Quest Schools within the projected one-year period will inspire confidence in the PFT's commitment to educational reform and in its willingness to promote the goal of student achievement.

Of significant concern to the Court was Mr. Kirsh's testimony about low teacher morale; the urgent need to respond to school safety and security issues, heightened by the rape and assault upon a public school teacher inside a school building and occurring on the morning of April 7; the need for basic allotments and resources to all schools; and the need for greater parental involvement in the schools. Mr. Kirsh also testified about the recent merger of two private organizations to create the Philadelphia Education Fund, which will focus on raising additional funds for the reform effort and which will assume responsibility for the Paths/Prism and School Collaborative Effort originally operated and funded by the PEW Foundation.

It is apparent that the Reform Plan and its Action Design along with task force reports and other attachments filed with the Court represent extensive effort by the School District, its staff and task force members and that the effort demonstrates progress toward an ultimate resolution of the issues presented in these proceedings. While the Reform Plan does not fully comply with the November 1994 order, as discussed below, the Court

1. The PFT president reiterated many of the positions contained in the PFT submission to the Court on October 15, 1994 responding to the Educational Panel Report. The PFT submission was admitted into the record on April 7, 1995 as Court Exhibit J.

lauds the School District's plans now underway to provide full-day kindergarten to all eligible students in racially isolated schools by September 1995 and to all eligible students throughout the School District by September 1996. Kindergarten plans shall not be implemented, however, at the expense of the existing Headstart and other pre-school programs, which are to continue in full operation by the School District. The Court finds that the School District's plans for providing full-day kindergarten are in compliance with the November 1994 order.

## II.

The Court finds that the plans developed by the School District related to the following items are in compliance or in substantial compliance with the Court's order as noted hereafter. Those areas in compliance include:

Collaboration with the PFT to work with the State in developing rigorous teacher certification standards; reduced class size projections of 2:30 staff-to-student ratio for kindergarten beginning September 1995; collaborative efforts to expand pre-school and early childhood opportunities; study of the feasibility of expanding the school year; further development and expansion of the community school concept; bilingual education evaluation to focus on improving Hispanic students' achievement; special education evaluation of over and underrepresentation of Black and Hispanic students, to be completed by January 1996; class leveling no later than the end of the second week of school, with the ultimate goal toward class leveling by the end of the first week of school; hiring of more certified substitutes for the racially isolated schools; continuing efforts to secure additional outside funding sources; establishment of a comprehensive school safety plan; creation of alternative disciplinary schools; in-school accommodation and suspension rooms; and plans for periodic baseline data reports to the Court and to the public.

The areas in substantial compliance with the Court order and requiring some refinement to more fully comply with the order include:

Professional development of staff to the extent that it is driven by previously established standards for curricula and that teachers and principals are allowed meaningful input in the design and content of the professional development; reduced class size projections for pre-kindergarten, kindergarten and grades 1 through 3 and grades 4 through 12 to the extent that the District responds to questions raised by the Monitoring Committee Report and continues to pursue available remedies proposed in Appendix C to the Reform Plan; collaborative efforts to implement school-to-work and school-to-higher education programs to the extent responsive to Paragraph 11 of the Court order; and establishment of Equity Assurance and Professional Development Offices and Office of Standards and Assessments, to the extent that lines of authority are clearly defined in these offices.

The School District report due June 15, 1995 on magnet expansion and additional desegregation strategies must be reviewed by the Court before a determination of compliance can be made as to these elements.

The November 1994 order, in Paragraphs 2a, b, c, called for development of standards for curricula defining what students should learn and what teachers should teach to improve the academic achievement of students; intermediate achievement expectations and specific achievement goals for students in racially isolated schools; as well as a process to assess whether students have met intermediate and culminating goals. This information allows parents and the public to know what can be expected from the public schools. The School District must itself perform the educational function of developing standards for curricula under the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1–101—27–2702; it shall not delegate this function to the Education Fund nor to any independent organization, private business or other entity. Moreover, the School District Task Force Report on Standards and Assessments does not specifically address these requirements

of the Court order; in particular it calls for suspending norm-referenced testing without a viable alternative and in direct contrast to the Court order.

### III.

From an analysis of the Reform Plan and the *Monitoring Committee* report filed with the Court on March 7, 1995, and consideration of the testimony presented at hearings on the plan, the Court concludes that the School District's efforts have focused primarily upon educational restructuring and that school cluster plans, regional office support, lines of authority and duties of the various offices must be more fully delineated and clarified. In addition, the School District projects the need for another 1600 employees: The central administration bureaucracy has been increased rather than reduced to be made more efficient and effective, and a complex organizational structure has been created. The School District must move away from a bureaucracy that spends over 80% of its operating budget on personnel costs alone and move toward a system that directs a greater proportion of its funds for basic allotments to the schools for educational purposes.

To date, no evidence has been presented by any party to justify elimination of the regional supervisory organization, clearly recognized to be functional and supportive of the schools and community, and replacement of it with a substantially larger and more complex bureaucracy requiring greater funding and human resources.[2] The November 1994 order directed the School District to develop an organizational structure to, among other things, supervise the school-based management efforts and to carry out system-wide policies of the School District.

The School District's proposal is to eliminate the six regional superintendents and the director of high schools and to replace them with 22 cluster leaders. No evidence was presented to show that this proposal is an effective or reasonable alternative to the regional office structure. Nonetheless the School District proceeded in spite of the Court's November 1994 order with its plans to eliminate the regional offices and despite the Court's subsequent on-the-record explanation of its position. Furthermore, the Monitoring Committee report raises valid questions regarding the cluster concept that also require a response.

Although not discounting the advice and opinion of educational experts, this Court will not ignore the views and opinions of students, parents, teachers and principals—and there has to be a willingness on the part of these "stakeholders" to assume their responsibilities to make educational reform a success. The School District's failure to meet formally with the PFT to discuss the Reform Plan prior to its submission and to elicit the Union's effective involvement in its development defeats the unified goal that all parties and the Court expect to accomplish. Thus there is the need to incorporate and focus upon the teacher and principal as well as the student and parent as central participants in the educational reform effort and to guarantee their meaningful involvement in the process.

The Court reiterates the need for concentrated attention and action to respond effectively to school safety and security and school climate issues so that teachers and students feel safe in their schools; for greater parental involvement in the schools; and for provision of a strong basic educational foundation for public school students.[3] Once

---

**2.** The School District reorganizational plan appears to introduce multiple new components to the organizational structure through additional offices, networks, councils, learning communities, next-step centers and so forth. The Court did not require the complex and multi-layered structure proposed; it directed the School District to streamline and reorganize the administrative and operational functions to provide efficient and effective support to the schools and to establish, inter alia, one local school council, or other designation, for each school and to institute an

Equity Assurance Office, Professional Development Center, and Recruitment and Educational Counselling Office as a function of the Equity Assurance Office.

The Court will take no position on the School District's cost projections until a modified plan is filed, except to note that the substantial increase in personnel cannot be justified.

**3.** *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 168 Pa.Common-

the School District fully understands that it shares the goals and responsibility of the Court, the Human Relations Commission, individual intervenors, parents, teachers and principals as well as the public to improve its schools, the process should begin to proceed more effectively and efficiently.[4]

The Court is nevertheless confident that the School District, utilizing the expertise of its many dedicated employees, can present a modified plan for approval by the Court. Once filed and approved, all concerned may expeditiously move toward implementing a quality education plan for all of the children in the Philadelphia public schools.

**IT IS THEREFORE ORDERED** that the School District make the following modifications to its Reform Plan by May 15, 1995 to comply with the Court's November 1994 order.

### Parental Involvement

1. The School District shall develop a cohesive plan for distribution to the schools to promote and encourage immediate parental involvement and partnership in the schools, particularly in the racially isolated schools, and to enlist parents in resolving discipline and school safety issues confronting the School District. Multiple parental involvement strategies, including the Project Parent Involvement introduced at King High and outside governmental assistance in promoting parental involvement, are available to the School District that, to date, have not been fully utilized. The School District is therefore ordered to take all reasonable and effective measures to incorporate parental involvement throughout the public schools as parents must share in the responsibility to improve the quality of the public schools. Parental involvement cannot wait for school council elections to be completed over the course of the next two or more years.

### Teaching and Learning/Professional Development

2. The School District shall modify its Reform Plan to include a plan, with projection of responsible School District personnel and/or offices, that describes the criteria for selection and applicability of curriculum standards and forms of assessment that shall govern what teachers will teach and what students will learn; states whether standards drive assessment or whether assessment drives standards; and states whether the standards shall be set at the maximum level, at the norm or expected level of achievement or be cast as minimums. These decisions affect, among other things, remedial or corrective strategies, what shall be taught in the schools, and the formulation of policies concerning grade promotion, graduation and transition to higher education and/or employment. The process for development of a curriculum plan shall be completed by January 1996.

### Educational Improvement

3. The School District shall describe how it will expand career academies and magnet programs and themes to promote the school-to-work and school-to-higher education programs and to afford these opportunities to Black and Hispanic students.

4. The Reform Plan shall include a provision that during the school year immediately following development of the curriculum plan, the School District shall require each school to establish a self-evaluation process and to conduct a self-study addressing student achievement, instructional programs, professional development needs, parental and community involvement, school climate and safety.

5. The School District shall develop a plan for providing more experienced teachers in the racially isolated schools.

wealth Ct. 542, 651 A.2d 186 (1994); *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 161 Pa.Commonwealth Ct. 658, 638 A.2d 304 (1994).

4. Counsels' motions to join, inter alia, the Commonwealth of Pennsylvania and the Governor will be ruled on by the Court upon submission of a modified Reform Plan which complies with the Court's order.

*Desegregation Strategies*

6. The report to be submitted to the Court by June 30, 1995 shall incorporate, in addition to existing desegregation strategies, all other feasible voluntary desegregation strategies, including, among others: changes in school attendance boundaries; changes in school feeder patterns; methods for selection of school clusters to avoid further racial segregation of the students; site selection for construction of new school facilities; methods for site selection for lease facilities; availability of student transfer opportunities; reassignment of students due to overcrowding; culturally diverse educational and social activities; enhanced use of magnet, exemplary and academic enrichment learning programs in racially isolated schools; and a pupil assignment process that avoids the potential for increased racial isolation.

*Resources*

7. The School District's Reform Plan does not fully respond to the audit issues raised in the Court's order relative to reductions in central administrative staff positions, follow-up of prior audit findings and recommendations, review of school board member expenditures, and other areas not covered by the Task Force on Management and Productivity audit. The Court is satisfied that the Task Force will conduct a full and thorough audit of the limited areas within its scope, and the Court will review the Task Force report due by August 1995 for compliance as to the areas audited.

*School Climate, Safety and Discipline*

8. The School District shall submit by May 15, 1995 a plan providing for the reinstatement of home and school visitors by September 1995 to service schools that experience the highest absenteeism and truancy rates, and the School District shall demonstrate how it intends to currently provide a safe school environment for its teachers and students.

9. The School District shall develop a model voluntary dress code for distribution to the schools, prior to the end of the current school year, along with information concerning estimated costs for compliance with the dress code and any other information to assist schools in making the decision whether to institute a dress code.

*Organizational Restructuring*

10. The School District shall require that the equity formula to be developed for purposes of resource allocation include, as an essential element, an increment triggered by a school's status as racially isolated and shall submit the proposed formula to the Court and to the parties at least thirty days prior to implementation.

11. The School District shall clarify the authority and functions of the various proposed offices and networks to eliminate duplication and overlapping of responsibility, and the School District shall modify its plan to comply with Paragraph 32 of the Court's November 1994 order for an effective organizational structure that supervises the school-based management effort, to carry out system-wide policies within each region, to provide community support to schools and parents, and to perform all functions necessary to ensure that central office services are effectively utilized by the schools and that school-based management is effectively and efficiently implemented.

*Facilities*

12. The School District shall require that the examination by the Management and Productivity Task Force of all buildings be conducted so that racially isolated schools are completed first and shall require that the comprehensive plan for repairs or replacement give priority to the racially isolated schools. The comprehensive plan shall be submitted to the Court and the parties at least thirty days prior to implementation.

*Reporting and Monitoring*

13. The School District, as a part of its current compilation of baseline data for assessment purposes, shall include compilation of data consistent with that identified by the Human Relations Commission in Appendix A attached to its Statement of Position and Memorandum in Support Thereof submitted on October 25, 1994. Any objections to the

content or degree of data required shall be submitted to the Court for resolution. The School District shall also develop an external monitoring process.