**Pennsylvania HUMAN RELATIONS COMMISSION, Petitioner,**

v.

**SCHOOL DISTRICT OF PHILADELPHIA, Respondent.**

**ASPIRA of Pennsylvania, Intervenors.**

Commonwealth Court of Pennsylvania.

Heard Sept. 17, 2001.

Decided Sept. 28, 2001.

Michael Hardiman, Philadelphia, for petitioner.

Lynn Rosner Rauch, Philadelphia, for respondent.

Michael Churchill, Philadelphia, for intervenors, ASPIRA of Pa.

SMITH, Judge.

In May 1999 the Pennsylvania Supreme Court remanded the above-captioned school desegregation case to this Court to proceed with the enforcement of its 1994 Remedial Order.[1] The Remedial Order required the School District of Philadel-phia (School District) to undertake action to remedy the historical discrimination found to exist against Black and Hispanic children attending racially isolated public schools and to provide them with an equal educational opportunity. *See Pennsylvania Human Relations Commission v. School District of Philadelphia (HRC VII)*, 168 Pa.Cmwlth.542, 651 A.2d 186 (1994).[2] In its Remedial Order, the Court incorporated "the student, parent, teacher and principal as central participants in the educational reform effort, high academic standards and elimination of racial disparities in academic achievement as the primary missions, and rigorous curriculum framework as its core." *Id.* at 188–189.

I.

a. *Background*

In July 1999, at the request of the Pennsylvania Human Relations Commission, the Court convened the first of many court conferences which continued up to August 2001 to review the School District's compliance with various components of the Remedial Order.[3] The Court resumed the

---

**1.** *Pennsylvania Human Relations Commission v. School District of Philadelphia*, 557 Pa. 126, 732 A.2d 578 (1999) (Petition of Commonwealth and Governor Ridge). The Supreme Court remanded this case in May 1999 after assuming jurisdiction in July 1996 and ultimately vacating on procedural grounds the Court's order, *inter alia*, for the Commonwealth and Governor of Pennsylvania, joined as parties to the case, to provide additional funding to the School District to defray costs and expenses associated with remedying discrimination against Black and Hispanic students in racially isolated schools and for the Pennsylvania Intergovernmental Cooperation Authority to monitor and inspect the School District's fiscal and management activities, as it has done for the City of Philadelphia, to assist the School District in resolving its underlying fiscal problems.

**2.** The Court crafted the Remedial Order after consideration of extensive trial testimony from national and local educational experts and an evaluation of School District instructional and other activities by a Court-appointed team of seven national and local educational experts. Components of the Order relate to parental involvement, educational improvement, desegregation strategies, resource generation, school climate, safety and discipline, organizational restructuring, accountability, facilities, overcrowding and reporting and monitoring of School District progress. *See also Pennsylvania Human Relations Commission v. School District of Philadelphia (HRC VI)*, 161 Pa.Cmwlth.658, 638 A.2d 304 (1994) (Court determined that children in racially isolated public schools in Philadelphia were denied equal educational opportunity).

**3.** Additional conferences were held over the

efforts it began prior to July 1996 to enforce, *inter alia,* the School District's development of a Comprehensive School Safety and Security Plan to reduce violence and disruption in the schools so as to promote student learning and the development of a system-wide Curriculum Plan to guide the School District in its instructional activities while it endeavored to improve student academic achievement and to provide an equal educational opportunity to students in the racially isolated schools. Enforcement activity also centered around strategies to encourage greater parental involvement in the racially isolated schools.

The School District has for the first time during this litigation developed a Comprehensive School Safety and Security Plan, which begins to thoroughly address many of the school safety and security issues it currently faces. The School District also developed a new Curriculum Renewal Plan, which builds upon its curriculum frameworks and offers a document that will guide the School District's work in the areas of curriculum and instruction. The Plans were filed with the Court in May and September 2001, respectively. *See* School District Exhibits 2 and 10. The Court held hearings on September 17, 2001 to review the Plans in particular and the School District's compliance with various other components of the Remedial Order in general.

### b. *School District Witnesses*

The School District presented the following credible and highly experienced witnesses to testify at the hearing. Interim Chief Executive Officer (CEO) Philip R. Goldsmith was hired by the School District in his current capacity in November 2000, after the School Board decided to follow the CEO model adopted by many of the larger urban school districts around the nation. His responsibilities include oversight of the School District's fiscal, budgetary and managerial affairs associated with its 264 buildings. That oversight entails "fortifying" the system to make it a safe and secure environment where students have qualified and motivated teachers in each classroom. A graduate of George Washington University School of Law, Mr. Goldsmith brings experience in the fields of law, journalism, local government, banking and human resources consulting. Among his prior positions, Mr. Goldsmith has served as president of PNC National Bank, Executive Director of The Philadelphia Bar Association and Deputy Mayor of the City of Philadelphia for Policy Planning.

Chief Safety Executive Dexter Green was hired by the School District in May 2001 to oversee the Office of School Climate and Safety, while remaining in a liaison role with the Philadelphia Police Department. He is responsible for implementing the Comprehensive School Safety and Security Plan. His functions include, *inter alia,* the assessment and evaluation of current School District programs to achieve a system-wide approach to school safety using best practices; oversight of a more proactive prevention and intervention program; training and deployment of School District police personnel; monitoring and enforcing a strengthened district-wide crisis management plan; and gener-

---

past two years between and among the parties and their Counsel, Michael Hardiman, Michael Churchill and Lynn R. Rauch, the Court-appointed Education Monitors, Dr. Frank Tota and Dr. Dolores Silva, and at times with representatives and officials of the Philadelphia Federation of Teachers (Jack Steinberg, Jerry Jordan and Rosalyn Johnson). Dr. Tota is the former president of the national Urban School Superintendents Association, and Dr. Silva is a professor and national scholar in curriculum theory and design.

ally working toward the creation of a safe environment in the schools.

A former mathematics teacher educated at LaSalle University and Temple University, Mr. Green has served as a Police Lieutenant, Police Captain, Police Inspector and Chief Inspector for the Philadelphia Police Department as well as Acting Chief of Police for the Philadelphia Housing Authority Police Department. He has acted as a consultant in police training and community policing with various police departments and municipalities located in Washington, D.C., San Diego, California, Austin, Texas, Atlantic City, New Jersey and Providence, Rhode Island, among others. The School District offered Mr. Green as an expert in public safety, community engagement, police training and security issues, without objection from opposing counsel. Mr. Green was so qualified by the Court.

Chief Academic Officer Dr. Deidre R. Farmbry assumed her newly created position in August 2000. She is responsible for the curriculum and overall instructional activity of the School District, and she will oversee implementation of the Curriculum Renewal Plan. Her functions include improving the professional development of teaching staff and expanding parental involvement in the schools. Dr. Farmbry received her Doctor of Education degree from the University of Pennsylvania, with a dissertation focusing on school reform. She received a Superintendent's letter of eligibility in 1992. Dr. Farmbry has 27 years of experience with the School District, having served as a former Cluster Leader of the Roxborough Cluster, Principal of Simon Gratz High School, Administrative Assistant to the former and highly regarded Superintendent of Schools Dr.

Constance B. Clayton, English Department Head and high school English teacher.

Deputy Academic Officer Dr. Joseph A. Jacovino returned to the School District in August 2001 to head its new Office of Curriculum, Instruction and Assessment. He reports directly to Dr. Farmbry and is responsible for overseeing the areas of curriculum, instruction and assessment of student progress. Dr. Jacovino was employed for more than 20 years in the School District before his return in August. He served in the capacity of Director of the Office of Curriculum Support, senior high school Curriculum Coordinator, secondary Social Studies Curriculum Specialist, Administrative Head of the Parkway Program and Head of the Parkway Program Social Studies Department. He holds a Doctor of Education degree from the University of Pennsylvania with a focus on education leadership in the area of curriculum and instruction. Dr. Jacovino currently serves as an adjunct professor of curriculum theory at a local university, and he has provided consulting services to various school districts and educational entities on issues surrounding the development and implementation of academic standards.[4] The School District offered Dr. Jacovino as an expert in the areas of curriculum, instruction and assessment and related professional training, without objection from opposing counsel. He was so qualified by the Court.

c. *Comprehensive School Safety and Security Plan*

The Remedial Order required the School District to "provide a school climate in

---

4. *See* School District's Exhibits 1, 7, 9 and 11 (representing biographical documents for each of the School District's witnesses).

which teachers can effectively teach and students can properly learn." *HRC VII,* 651 A.2d at 192. The Court directed the School District to incorporate into its Comprehensive School Safety and Security Plan all feasible and effective recommendations submitted by law enforcement participants in the School District's Law Enforcement Task Force developed in Spring 2000; by the Harnett Consulting Team's June 2000 "Report to the School District on School Safety"; by the Pennsylvania House of Representatives Urban Affairs Committee, November 2000 "Report of First Class City's Subcommittee Investigation Into Violence in Philadelphia Public Schools"; by the Philadelphia Federation of Teachers (PFT); and by the Pennsylvania Human Relations Commission. The Plan contains recommendations and input from the above sources in addition to the other resources relied upon by the School District.

Mr. Goldsmith explained the development process and indicated that the School District solicited input from school districts in New York and Houston and other cities to create a comprehensive approach to school safety. The Comprehensive School Safety and Security Plan is designed to improve school climate and environment by promoting a sense of discipline and fairness; to minimize classroom disruption quickly and effectively; and to increase the safety and security of students and teachers. Mr. Goldsmith candidly acknowledged that adequate school safety is a central office function, and he intends to "transition out" of the practice whereby schools are forced to choose between an art or math teacher to obtain needed security personnel. A major goal is to professionalize the School District's security personnel and non-teaching assistants (NTAs), to deploy security personnel appropriately and to train personnel in the proper use of existing technology. He be-

lieves that the Plan represents a good "blueprint" for the action that must be taken and that it provides clear objectives, strategies to meet those objectives, outcomes and timelines and a process for implementation.

Mr. Green testified that his efforts will be directed by the Comprehensive School Safety and Security Plan, which in his professional opinion contains realistic and attainable goals. He has assessed and evaluated the School District's current security programs, and he described his system-wide approach to using best practices to create a safe environment in the schools. Mr. Green will work closely with principals to review individual school safety and security plans and will make prevention and intervention a priority along with enforcement. Plans are underway to provide professional development through the Philadelphia Police College for the School District's 452 school police officers, the third largest municipal police force in the Commonwealth. Training will center around law enforcement and juvenile justice issues and the handling and managing of disruptive students. NTAs will receive fewer hours of similar instruction and training, and noontime aids will receive, to a lesser extent, in-house training.

Mr. Green articulated other priorities, which include the establishment of uniform criteria for the deployment of security personnel in middle and high schools and an assessment of the effectiveness and use of existing technology (e.g., metal detectors, swipe card systems, mobile scan units and cameras). He emphasized the School District's top priority to expand the Safe Corridors Program so that at a minimum every elementary school is included, and he stated that racially isolated schools will take first priority in this process. He observed that the success of this program depends upon participation first and fore-

most from parents as volunteers in making sure that their children have safe passageways to their respective schools. Mr. Green provided assurances that his office will incorporate other exemplary violence-prevention programs in the racially isolated schools and that the School District will expand throughout all of the schools an anti-bullying program recognized as an exemplary practice by the United States Department of Education. The program currently exists only in North Philadelphia schools. In addition, school discipline data will be evaluated to assess racial impact, and his office will coordinate with other School District offices to expand the truancy program to improve student attendance.[5]

#### d. *Curriculum Renewal Plan*

The Remedial Order required the School District to develop clear educational standards for curricula which define what students should learn and what teachers should teach to improve the academic achievement of students. The need to develop strong student foundations in language arts, math and other core academic subjects remains a paramount challenge, particularly in many of the racially isolated high schools. The Remedial Order also called for the School District to develop an effective professional development program to correspond to its curriculum plan. Dr. Farmbry stated that her priority is to foster uniformity in instructional practices and district-wide coordination in instruction and assessment and centrally designed professional development. Random and disconnected professional development will cease. To this end the School District created a new organizational structure which eliminated the prior cluster model with its many layers and replaced it with 10 Academic Area Offices to prominently place the focus where it should be. These offices follow feeder patterns consistent with the cluster model and include 35 to 40 schools per area. The new organizational structure includes a director of instruction, a director of curriculum and a director of assessment along with a new Office of Principal and Teacher Development.[6]

Dr. Farmbry testified that for the past year she assessed the continuity in instructional programs toward development of the Curriculum Renewal Plan, which will guide all of the activities of her office. The Plan contains the following four goals: implement core curriculum, match curriculum and assessment, meet the needs of special populations and connect professional development to the core curriculum.[7] Curricu-

---

**5.** Reducing the threshold for Truancy Court intervention from 25 to 20 unexcused absences will no doubt produce positive results along with other stated initiatives, but more drastic action is needed to reduce student absenteeism at a faster rate than projected. The truancy officer was eliminated and replaced with family or other network staff under the prior Administration, with the unmet expectation that attendance would significantly improve. Perhaps the time has come to revisit the effectiveness of truancy officers and whether they should resume a role in resolving the high student absenteeism within the School District.

**6.** With each new administration, the tendency exists to change the current organizational structure. The new Academic Area structure, however, appears to offer a less complex and more focused way of providing instruction to public school children. Because students, parents and teachers are entitled to some measure of consistency and stability in the educational reform effort underway in Philadelphia, it is anticipated that the present organizational structure will remain, and be strengthened where necessary, on into the indefinite future.

**7.** The criteria followed for curriculum development is implicit but nowhere is it expressly stated in the Curriculum Renewal Plan. The School District will provide this information to Counsel and to the Court, and it must be added as an addendum to the Plan.

lum frameworks adopted by the School Board in 1997 provided the starting point, and they have been modified where appropriate and aligned with available state academic standards. According to Dr. Jacovino these frameworks articulate a full year of content but do not specify what should be taught or when. That function was articulated in development of the new "scope and sequence" schematic, which details the content to be taught students and the order in which it is to be taught along with other guides to assist teachers, particularly new ones, in their instructional activity. The Plan also for the first time provides a strong component for professional development, and it allows for an audit of the schools to ensure that they offer appropriate grade level courses. The School District disaggregates its student assessment data by race, and it will intensify its focusing on the racial disparities in achievement as well as the racial disparities in student assignments to special education programs.

Dr. Farmbry and Dr. Jacovino have instituted many other initiatives, including new report cards to reflect the Curriculum Renewal Plan. New features of the reorganization include the assignment of instructional coaches to classrooms and an expansion of responsibility on principals to assure better training of their teachers. Curriculum councils now exist to review and offer advice to central staff on curriculum initiatives and to participate in the strengthening of each middle and high school's curriculum program. These councils are comprised of teachers selected by their principals, and they possess expertise in particular content areas.

Dr. Jacovino readily acknowledged that the work in his office will be ongoing, and he opined that the Curriculum Renewal Plan represents an ambitious but a logical document containing order and sequence for subject content delivery, which will ensure an equitable opportunity to all students to learn. The Plan represents the "yardstick" by which Dr. Jacovino's office will conduct its district-wide activity and the focus for professional development. Appendix E ("Triangle") to the Plan contains a listing of its components: mission, curriculum vision, curriculum frameworks, scope and sequence, course guides, units of study and lesson plans. The mission includes improving the academic achievement of students in the areas of literacy, math and science, and the vision incorporates a coherent curriculum plan containing a unified and core curriculum.

Dr. Jacovino explained each of the components of the Curriculum Renewal Plan in greater detail and explained how the School District developed the new scope and sequence for each identified content area to help organize content for delivery by teachers in a sequential manner. The scope and sequence represents a floor and will be mandatory for all of the schools, all of the teachers and all grade levels, as will other components of the Plan. Dr. Jacovino indicated that the listing represents the model for the Plan and the shift to a new and more focused approach to the way the School District intends to conduct its instructional activities. This shift also includes a change in the curriculum, instructional and assessment activities related to special student populations and the addition of needed supports for teachers required to teach this population in the regular education classroom. He also cautioned that the School District must ensure that the Plan and its learning goals in the scope and sequence match the learning goals in the assessments used to measure student progress. Assessment profiles currently underway should produce this result and at the same time reduce the number of assessments so that instructional time may be increased.

### e. *Outcomes*

The School District projects a two-year implementation period for its Comprehensive School Safety and Security Plan and the Curriculum Renewal Plan. Because of the House of Representatives' Urban Affairs Committee Report, the School District recognizes the need for more accurate and thorough reporting of school safety violations, and it has committed itself to this process. Some of the stated outcomes for the Comprehensive School Safety and Security Plan include, among others, an increase in parental involvement through school councils and other strategies along with an expansion of community partnerships; an increase in the average daily attendance of students district-wide; a revision of the School District's Code of Student Conduct; an increase in alternative placements of disruptive students; a more effective strategy for plotting school violence trends; the adoption by each school of a safety/crisis-management plan based upon a standardized model; and the development of audit procedures for each school.

Projected outcomes for the Curriculum Renewal Plan include, among others, the implementation of the pilot English language arts and math K–12 scope and sequence and core units of study during 2001–2002 for full implementation next year; a reevaluation of textbooks and materials to ensure that core content areas are adequately addressed; a completion of the assessment profile by September 2001 to present to the School Board; a completion of professional development for K–3 teachers on the new K–3 literacy assessments; the convening of regular data review meetings throughout the year to monitor, target and address student achievement results; and a review of curriculum and assessment initiatives to determine the impact on special student populations and professional development regarding instructional practices for these students.

### II.

### *Other Compliance Areas*

The Court ordered full-day kindergarten for all eligible students in racially isolated schools effective September 1996 and for all remaining eligible students effective September 1997. The School District agreed to comply with the Court's Order after contempt proceedings were convened in 1996. Dr. Farmbry noted that state test results (PSSA) for the past year of fourth grade students provided full-day kindergarten exceeded the statewide averages in reading and math and that subsequent groups of children who received full-day kindergarten are entering first, second, third and fourth grades with much higher skill levels than before. Katherine Conner, a long-time School District Administrator (now Executive Director of the Office of Policy Planning and Compliance), reinforced the fact that students who received full-day kindergarten have consistently performed at higher levels in reading and math and that a review of the past 5 years of the kindergarten program indicates that it will have a lasting effect in terms of student achievement. Also she noted that based on SAT–9 test results for last year, the racial gap in academic achievement has begun to narrow for the lower grades and in eighth grade reading. These results demonstrate in part the wisdom of investing in early education programs for the City's children, particularly children attending the racially isolated schools.

Over 1000 literacy interns are now employed within elementary schools in grades K–2 to reduce class size. The Human Relations Commission shall determine whether all of the elementary racially isolated schools have been assigned literacy

interns in grades K–2, to what extent they have been assigned to the remaining racially isolated schools and in general the extent to which the School District has prioritized literacy programs for all racially isolated schools. Literacy issues related to students in the racially isolated schools have continued to frame this case. It therefore is essential that priority be given to these children when decisions are made for schools to participate in new or existing literacy programs, some of which have been identified in the Curriculum Renewal Plan (Reading to Succeed, Reading for Excellency and Technology Literacy Challenge).

Dr. Farmbry noted that 91 certified school councils have been established in 111 racially isolated schools and that full-time efforts are underway to establish councils in the remaining 20 racially isolated schools, but "suitable alternatives" are now being considered. Because parents and children in the remaining schools are entitled to the same or to a greater level of effort generated in creating school councils in the other schools, neither the Court nor the School District should abandon this requirement. Therefore, the School District shall complete this process as previously directed and pursuant to prior assurances given to the Court that all racially isolated schools will have school councils by the end of 2001. This period may be extended to June 2002. The School District clearly is not precluded from otherwise creating ways to encourage parental involvement in these remaining schools. It is crucial that every available strategy be utilized to get these parents more actively involved in the education of their children.

### III.

#### Conclusion

The School District's representatives have worked over the past two years with the Court, the Human Relations Commission and the Intervenors, and they readily agreed at the hearing to continue to meet with Counsel for the Human Relations Commission and for the Intervenors along with representatives of the PFT to ensure that all feasible steps are taken to effectively implement the new Comprehensive School Safety and Security Plan and the new Curriculum Renewal Plan. The Human Relations Commission shall continue to monitor the School District's progress and may require an annual report beginning in June or September 2002 of the School District's implementation of its new Plans and other compliance activities. Particular emphasis should be on the review of assessment data documenting the rate of academic achievement of students in racially isolated schools and the School District's progress in expanding parental involvement in these schools. For the reasons discussed, and at the request of the Human Relations Commission and the Intervenors, the Court hereby approves the School District's Comprehensive School Safety and Security Plan and its Curriculum Renewal Plan for full implementation and planned distribution.

After several years of exercising jurisdiction over this enforcement case, the Court is satisfied that the School District has made a significant and continued effort to comply with the Remedial Order and that the Comprehensive Safety and Security Plan and the Curriculum Renewal Plan present a renewed opportunity for the School District to effectively respond to many of the educational issues that it faces. Despite more than 30 years of litigation in this case and the indefensible delays in providing an equal educational opportunity to children in the racially isolated schools, the foundation nevertheless remains for the Court's enforcement of

this right. The United States Supreme Court in *Brown v. Board of Education of Topeka (Brown I)*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), warned that no child may reasonably be expected to succeed if denied an education, which is a right that must be made available on equal terms. Thirteen years later in 1967, the Pennsylvania Supreme Court in *Pennsylvania Human Relations Commission v. Chester School District*, 427 Pa. 157, 233 A.2d 290 (1967), graphically described the consequences to children denied equal opportunities in education.

As detailed more fully in earlier opinions in this matter, the Human Relations Commission issued an amended final order in 1972 determining that the School District was unlawfully segregated in violation of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951–963, resulting in a lack of equal educational opportunity. Over the years various plans have been proposed to remedy that illegal and pernicious condition. The Comprehensive School Safety and Security Plan and the Curriculum Renewal Plan have now been proposed and accepted by the Court and hold promise that, if effectively implemented, they will advance the goals of this litigation. The Human Relations Commission shall request the Court to close this case when it is satisfied that the School District has demonstrated that it can and will provide an equal educational opportunity to all of its students.

### ORDER

And now this 28th day of September, 2001, the Court hereby approves the School District of Philadelphia's new Comprehensive School Safety and Security Plan and its new Curriculum Renewal Plan filed with the Court in May and September 2001, respectively. The Pennsylvania Human Relations Commission shall monitor the School District's implementation of these Plans and its compliance generally with the Court's 1994 Remedial Order consistent with the foregoing opinion.