**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Petitioner,**

v.

**SCHOOL DISTRICT OF PHILADELPHIA, Respondent.**

**Harry and Annemarie GWYNNE, Aspira of Pennsylvania, Intervenors,**

v.

**COMMONWEALTH of Pennsylvania, Thomas J. Ridge, Governor of the Commonwealth of Pennsylvania, the City of Philadelphia and Edward Rendell, Mayor of the City of Philadelphia, Additional Respondents.**

Commonwealth Court of Pennsylvania.

Decided Aug. 20, 1996.

---

1. Of passing interest is the recent Pennsylvania Supreme Court decision eliminating veterans' preference points in governmental hiring. *Hoff-* *man v. The Township of Whitehall, et al.,* —— Pa. ——, 677 A.2d 1200 (1996).

Mark J. Levin and Lynn Rosner Rauch, for Respondent, School District of Philadelphia.

Edward F. Mannino and William G. Frey, Philadelphia, for Respondent, Commonwealth of Pa.

Joseph A. Dworetzky and Richard Feder, Philadelphia, for Respondent, City of Philadelphia.

Michael Churchill, Philadelphia, for Intervenors, ASPIRA, et al.

Patricia Lowe, for Intervenors, Olney-Oak and Lane-Feltonville, et al.

SMITH, Judge.

Trial was conducted in this case on the issue of the liability, if any, of the Commonwealth of Pennsylvania and its Governor and the City of Philadelphia and its Mayor to pay any additional costs necessary for the School District of Philadelphia to comply with the Court's November 28, 1994 remedial order. The order directed the School District to remedy the racial disparities and unequal educational opportunities that exist in the Philadelphia public schools. *Pennsylvania Human Relations Commission v. School Dist. of Philadelphia (HRC VII)*, 168 Pa. Cmwlth. 542, 651 A.2d 186 (1994).

The record in the liability phase of this case revealed the need for remedial measures that, if properly developed and implemented, would effectively deal with the pervasive discriminatory conditions in the School District. In devising the remedial order, the Court kept in mind that desegregation orders must respond to the facts of a particular case; that they are not limited or restricted solely to pupil reassignment plans; and that other independent or ancillary remedial relief may be warranted to cure the consequences of the racial segregation found to exist.

The current proceedings were held pursuant to the Court's November 4, 1995 order joining the Commonwealth and Governor and the City and Mayor in this action at the

Michael Hardiman, Assistant Chief Counsel, for Petitioner.

request of the School District and Intervenor ASPIRA. The November 1995 order provided that the School District and ASPIRA had the burden to establish the liability of the additional respondents to provide funding to pay costs associated with the Court's November 1994 remedial order. *Pennsylvania Human Relations Commission v. School Dist. of Philadelphia (HRC XI)*, 667 A.2d 1173 (Pa.Cmwlth.1995). The order further provided that the joined parties would be given an opportunity to demonstrate that they lacked the ability to pay additional funds to the School District.

This is not a case that challenges the equity and/or adequacy of the Commonwealth's statewide education financing scheme. *See Pennsylvania Association of Rural and Small Schools (PARSS) v. Ridge*, No. 11 M.D.1991. It is about the adequacy of funding to the School District to allow it to comply with the remedial order. At the center of the current funding proceedings and all other proceedings conducted during the past twenty-five years of this litigation is the failure of the School District to provide to Black and Hispanic students in racially isolated schools the same educational opportunity afforded to their White counterparts.

After an extensive trial schedule associated with enforcement of the Pennsylvania Human Relations Commission's 1972 order requiring the School District to develop and to submit to the Commission a plan to correct the de facto segregation within the schools, the Court issued an opinion and order on February 4, 1994 granting the Commission's petition for enforcement of its final order and the April 15, 1983 order of Commonwealth Court. *Pennsylvania Human Relations Commission v. School Dist. of Philadelphia (HRC VI)*, 161 Pa.Cmwlth. 658, 638 A.2d 304 (1994). The Court found that the School District failed to desegregate its public schools by all feasible means and concluded that the School District has continued to maintain a racially segregated school system

that denies to Black and Hispanic students in racially isolated schools the right to an equal educational opportunity mandated by law.

The record developed during trial on the enforcement action graphically demonstrated that equal educational opportunity is denied to Black and Hispanic children in racially isolated schools. The Court thereafter appointed a team of educational experts who, on September 28, 1994, submitted a report to the Court containing various recommendations for curing the racial discrimination within the school system. It was after the submission of that report and subsequent hearings that the Court issued the November 1994 remedial order requiring the School District, among other things, to develop and submit an educational reform plan designed to cure the racial disparities that exist in the School District. The School District submitted its initial reform plan to the Court on February 15, 1995, later modified at the direction of the Court.

Additional proceedings before the Court generated the orders dated April 27, 1995 and June 13, 1995,[1] and resulted from further attempts by the Court to facilitate compliance with the remedial order. Ultimately, the Court determined that most of the components of the School District's reform plan were either in compliance or substantial compliance with the remedial order. These components included, but are not limited to, the development of high academic standards; professional development of staff; full-day kindergarten for all eligible children in racially isolated schools by September 1995 and all remaining schools by September 1996; reduction in class sizes beginning with grades K–3; expansion of pre-school and early childhood opportunities; class leveling by the end of the second week of school in September; provision of books, computers and instructional materials; development and expansion of the community school concept; creation of alternative schools for chronically disruptive students and in-house accommoda-

tion and suspension rooms; and school-to-work and school-to-higher-education programs. Developing specific details of the remedial programs ordered by the Court was left to the discretion of the School District.

Trial in the final phase of this long-running litigation began on May 30, 1996, and the evidence was concluded on July 11, 1996 after nineteen days of trial. The record was closed as of July 29, 1996 after the submission of a stipulation by Counsel for the School District and the Commonwealth and Governor itemizing the expenditure of an additional $13.2 million in state funding for the 1996–1997 fiscal year, the submission of an audit report of the 1995–1996 School District consultant services contracts and the submission by Counsel of proposed findings of fact and conclusions of law and briefs.[2] The record extends over 4000 pages, 18 witnesses were presented and more than 100 exhibits were admitted. Upon a review of the record and the proposed findings of fact

and conclusions of law submitted by Counsel for the School District, ASPIRA, the Commonwealth and Governor and the City and Mayor, the Court makes the following necessary findings of fact and conclusions of law.[3]

## I.

## FINDINGS OF FACT

*School District Demographics/Finances*

1. The School District is the fifth largest school district in the country and is the largest school district within the Commonwealth. Current student enrollment is approximately 211,000 students, and enrollment for 1996–1997 is projected at 215,500 students. At the close of the 1995–1996 school year, there were 130,228 Black students who accounted for 63 percent of the enrollment; 23,133 Hispanic students who accounted for 11 percent; and 42,101 White students who accounted for 20 percent of the enrollment. There are 257

2. **School District** witnesses included: Irvin R. Davis, Managing Director; Katherine Conner, Associate Superintendent for the Office of Standards, Equity and Student Services; Dr. Jeanette W. Brewer, Deputy Superintendent; Jack A. Myers, Director of Financial Planning and Analysis; and Mark L. Spector, Deputy Managing Director for Business, Finance and Human Resources.

 **ASPIRA** witnesses included: Louis Volpe, Subsidies Technical Assistant; Karen DelGuercio, Strawberry Mansion Cluster Leader; Nancy A. Reid, Superintendent of Centennial School District; and David L. Crawford, M.D., Adjunct Professor of Economics, Wharton School, University of Pennsylvania, qualified as expert in labor economics.

 **Commonwealth and Governor** witnesses included: David W. Hornbeck, Superintendent, as and for cross-examination; Anthony B. Creamer, III, Partner, Arthur Andersen accounting firm and auditing firm, qualified as expert in financial analysis and claims evaluation; Thomas J. Reilly, Jr., Partner, Arthur Andersen, qualified as expert in economy and efficiency engagements; Scott L. Fones, Computer Systems Analyst, Department of Education; Steve Guttentag, Acting Chief Information Officer for the School District of Philadelphia, via deposition testimony; and Joseph A. Martin, Director of Government and Education Services for Arthur Andersen, qualified as expert in cost savings and efficiencies in school district labor relations and collective bargaining matters.

 **City and Mayor** witnesses included: David L. Cohen, Chief of Staff to the Mayor of the City of

Philadelphia; David Glancey, Chairman, Philadelphia Board of Revision and Taxes; Joan Reeves, Commissioner, Philadelphia Department of Human Services; and Dr. Robert P. Inman, Professor of Finance and Economics, Wharton School, University of Pennsylvania, qualified as expert in public finance, economics and tax policy.

 **Exhibits** are identified hereafter as "SD" for School District, "ASP" for ASPIRA, "CP" for City of Philadelphia and "C" for Commonwealth.

3. During trial various motions were made by the Commonwealth and Governor to exclude evidence and witnesses by other parties, many of which were granted by the Court. Arguments were presented by Counsel on numerous evidentiary issues and many rulings were made on evidentiary objections. The Court over Commonwealth objection allowed ASPIRA to present evidence from Commonwealth records concerning the revenue received by 61 surrounding school districts; this evidence was admitted within the Court's discretion and on the condition that the evidence would be given whatever weight that it should bear in these proceedings. *See* June 25, 1996 memorandum opinion and order detailing other trial and pre-trial rulings in this case. The ultimate decision by the Court was made based upon facts peculiar and unique to the School District, and the comparison data concerning surrounding school districts carried little weight with the Court.

schools in the School District and approximately 11,650 teachers.

2. Approximately 101,000 of the 211,000 students in the School District come from families receiving Aid to Families With Dependent Children (AFDC), and that number is expected to increase for the 1996–1997 school year. Approximately 73 percent of the student population is eligible for free lunch, and this extraordinary level of poverty increases the educational challenges and costs to the School District.

3. The School District's AFDC student population increased by 13.64 percent from 1992 to 1996, compared to a decrease of 5.89 percent in AFDC student population for all other Commonwealth school districts. During the 1994–1995 school year, the School District had 42.3 percent of the Commonwealth's AFDC student population. In 1993–1994, 45.8 percent of the students in the School District were from families receiving AFDC benefits. The following year, 47.7 percent of the students in the School District were from families receiving AFDC benefits. By contrast, the median for students from AFDC families in school districts in the five-county metropolitan area was 2.7 percent.

4. The 1995 school-by-school test results show that Philadelphia had 128 elementary schools where in excess of 50 percent of the fifth grade students scored in the lowest quartile in reading. In 94 elementary schools more than 64 percent of the fifth grade students scored in the lowest quartile in reading. At least 144 schools had fewer than 10 percent of the students scoring in the highest quartile in reading. The average SAT score for School District minority students is approximately 690 compared to a national average of 950.

5. The School District receives revenue from the Commonwealth designated as basic education subsidy, formerly ESBE, and other revenue for specific purposes. Since 1991–1992, the Commonwealth's basic education subsidy to the School District has not reflected the growth in School District AFDC student population, in the poverty level in Philadelphia and in total student enrollment. The School District does not challenge the Commonwealth's elimination of the ESBE funding formula as illegal; however, for 1996–1997 the School District's basic education subsidy is approximately $102 million less than it would have been under the former ESBE formula in effect prior to 1991.

6. The School District has 12.1 percent of the Commonwealth's public school student population and accounts for 10.9 percent of the total public school student expenditure in the Commonwealth. Available records show that for 1994–1995, the School District had the lowest resources and total expenditure per student of any school district in the region, or $6,261 per student; and the average suburban school district per student expenditure was $8,187. Philadelphia ranked 59th of 62 school districts in the area in terms of total student expenditure for the 1993–1994 school year.

7. The School District is the only school district in the Commonwealth that has no power to tax. The School District depends upon City Council for local revenue from real estate taxes, liquor-by-the-drink taxes, business use and occupancy taxes and public utility realty taxes. The School District's revenue falls within three categories: operating funds, capital funds and categorical funds. Operating revenue comes from local taxes and grants and from Commonwealth subsidies and grants; capital revenue comes from the sale of general obligation bonds; and categorical revenue comes from the federal government and private sources and must be utilized for specific purposes.

8. The School District receives 55 percent of the Philadelphia real estate tax revenue, and the City receives 45 percent; the School District receives 100 percent of the use and occupancy tax revenue. The real estate tax base is the assessed value of all taxable real property, and revenue represents proceeds of the assessments of real property multiplied by the millage rate established by City Council. The revenue generated from these taxes depends upon the assessed value of Philadel-

phia real estate. The use and occupancy tax base is a tax on the commercial use of real estate in the City.

9. From 1980 to 1991, the School District's local real estate tax revenue increased by 122.52 percent as contrasted with a 66.22 percent growth in the City's real estate tax revenue. Since 1991, the real estate tax revenue increased by 7.38 percent. During the period 1980 to 1991, the City increased taxes for the benefit of the School District 10 times, and during that period, local tax revenue for the School District increased by 133.25 percent. Since 1991, local tax revenue for the School District has not increased due to a decline in the real estate tax base, and no additional increases in tax rates occurred, except for enactment of the liquor-by-the-drink tax in 1994.

10. The School District received local tax revenue in 1996 of approximately $515 million, although local real estate tax revenue for that year was approximately $400 million and local business use and occupancy tax revenue was approximately $80.7 million. The School District would have received an additional $80 million in fiscal year 1995–1996 had the use and occupancy tax and real estate tax revenues grown at the rate of inflation since 1992. From 1991 to 1996, collection of real estate taxes increased by 4.3 percent, although collection in prior years increased by as much as 48.49 percent. The real estate and business use and occupancy taxes account for approximately 95 percent of the School District's local tax revenue.

11. The School District is required to submit an operating budget detailing the expenditures to be incurred in conducting its activities, and its proposed operating budget for 1996–1997 is found in the record at SD Ex. 1. The operating budget adopted by law by the Board of Education on May 31, 1996 is found in the record at SD Ex. 51. *See* Section 12–303 of the Home Rule Charter, 351 Pa.Code § 12.12–303. The School District's projected operating revenue for 1996–1997 is $1.45 billion. The School District ended its 1995–1996 fiscal year with a $21.7 million surplus. The School District projected a $148 million shortfall in revenue needed to fund remedial desegregation programs, to provide basic education and to comply with contractual obligations.

12. Extensive testimony was offered concerning the impact of prior budget cuts on educational programs. The Strawberry Mansion cluster leader testified about the loss in reading teachers, remediation classes, extended school days for students and classroom support personnel and about boarded-up windows and other critical maintenance problems in school facilities. The School District made more than $200 million in school-based budget cuts during the past several years, including reductions in reading teachers, librarians, summer school and support program teachers. From 1993–1994 to 1995–1996 alone, the School District has made over $60 million in school-based cuts.

13. An independent audit of non-instructional activities was conducted by the Greater Philadelphia First, a nonprofit business group participating in school reform efforts which was engaged to administer the Annenberg challenge grant of $150 million. Its Management and Productivity Task Force report identified $4.5 million in potential savings in School District operations in fiscal year 1996–1997, with higher savings in subsequent years to include slower growth in labor costs and other areas.

14. The Annenberg Foundation grants are included in the School District's operating budget as revenue, and these funds are included as other revenue rather than used as a basis for reduction in the expenditures claimed by the School District.

15. An audit of School District consultant services contracts indicates that in 1995–1996, the School District paid $50.2 million for these services. These funds were paid, among others, to local universities, educational consultants and local business and community groups. Consultant contracts represent an extraordinary expenditure for the School District, and this is an area where substantial cost savings can occur. System-wide proce-

dures do not exist for the selection of consultants, and therefore system-wide procedures must be developed and implemented as recommended by the audit.[4]

### City of Philadelphia

16. The City has a disproportionate share of children living in poverty when compared to the entire Commonwealth; 30 percent of Philadelphia children live in poverty compared to 15.4 percent of the remaining Commonwealth children. In 1990, 36.5 percent of Philadelphia children lived in families receiving AFDC, and by 1994 the percentage of Philadelphia children receiving AFDC increased to 43.1 percent, or more than four times the percentage of children living in poverty in suburban counties surrounding Philadelphia. The City has 13 percent of the population of the Commonwealth.

17. The population of the City has declined every year since 1950, from 2.1 million residents that year to 1.5 million residents in 1995. Among the primary causes for the decline in City population are the high tax rates and low quality of its schools. The City lost in excess of 200,000 jobs for the period 1969 through 1993, and while the total population decreased from 1969 to 1989, the number of residents living below the poverty line increased.

18. Between fiscal years 1981 and 1992, the City raised taxes 19 times, and Philadelphia residents and businesses are among the most heavily taxed within the five-county metropolitan region. Its residents are among the most heavily taxed within the Commonwealth and in the nation as a whole. Philadelphia has the highest wage tax, real estate transfer tax and business taxes in the country, and the City collected less tax revenue in 1992 than it did in 1981.

19. The Chief of Staff for the Mayor of the City of Philadelphia provided graphic details about the fiscal status of the City and its efforts to absorb the costs and expenditures associated with "municipal overburden." The City has the highest statewide rates of juvenile delinquency, families in poverty, child abuse cases, single-mother births, welfare recipients and AFDC recipients.

20. The City was near bankruptcy in 1991; in September 1990 the City's cash flow borrowing failed for the first time in history due to its fiscal conditions, and the three major bond rating agencies downgraded the City's bonds from investment grade to speculative grade (junk bond rating). The City's capital assets are approximately $42 billion, and if the City's ability to borrow money is jeopardized, so too is the City's ability to repair its infrastructure. In 1990, no underwriter was available to float the City's bonds at a time when the City experienced a third-year cumulative deficit of $73 million. The City's credit ratings on its long-term general obligation bonds were restored to the lowest rating considered investment grade by the three credit rating agencies in March and April 1995.

21. The City's fiscal crisis worsened in 1992. The City ended the preceding year with $130 million in unpaid bills and faced a loss of 1000 jobs per month during the period 1982–1992, or 1.25 percent of the City's job base each year. By the end of fiscal year 1992, the City projected a $250 million cumulative deficit.

22. Use and occupancy tax revenue increased in the period 1980 to 1991 by 579 percent, but since 1991 it declined by 15 percent. The tax collected by the City in 1992 was $100.9 million and in 1996, $80.7 million. Real estate values within the City have declined since 1992, and the real estate tax base (assessments) has grown 1.83 percent since 1991. By contrast, from 1981 to

---

4. Record support for the foregoing findings includes, inter alia, SD Exs. 1, 10, 22; ASP Exs. 1, 1A, 2, 2A, 8, 15B, 17, 17A, 33, 53; CP Exs. 27, 28, 30A, 38A, 38B, 107, 108, 108(a)–(c); C Exs. 4, 31; and Court Ex. A–1; Transcript pages (Tr. pp.) include, inter alia, 81–86, 95–98, 105–110, 116–117, 122–135, 167–168, 333, 348–349, 497– 498, 517–518, 524–525, 531, 732, 841–846, 1144–1146, 1182–1198, 1242–1245, 1287, 1325, 1347–1351, 1472–1473, 1482–1488, 1490–1502, 1512–1521, 1607–1647, 1666–1690, 2257–2260, 2714–2716, 3037–3041, 3280–3284, 3242–3263, 3317–3319, 3358–3362, 3704–3710, 4052–4060, 4092–4094, 4123, 4399, 4403–4404, 4833–4835.

1991 the real estate tax base grew by 58.21 percent. The assessed value of Philadelphia real estate dropped from $28.8 billion in 1992 to $28.7 billion in 1996.

23. Because of the City's severe fiscal crisis, the General Assembly enacted the Pennsylvania Intergovernmental Cooperation Authority Act for Cities of the First Class (PICA Act), Act of June 5, 1991, P.L. 9, 53 P.S. §§ 12720.101—12720.709, to assist Philadelphia in resolving its fiscal crisis. The PICA Board has authority to direct the Commonwealth to withhold payment of state funds to the City if the PICA Board determines that the City has failed to comply with its statutorily required five-year financial plan. The PICA Board has approved each of the five-year financial plans submitted by the City.

24. The City has balanced its budget for the last three fiscal years. It ended fiscal year 1995–1996 with a three-year cumulative surplus of $80.5 million, and it has projected substantial budgetary savings or additional revenue due to the City's recovery efforts. The $80.5 million surplus as of June 30, 1995 includes $50 million in one-time cash advances to the City, and $30 million of the surplus will be used to make up the City's fiscal year 1996 deficit. Effective January 1996, the City offered the first reduction in its wage tax and business privilege tax in approximately fifty years in an effort to increase its competitive advantage.

25. This year, the City made a one-time grant of $15 million to the School District. The liquor-by-the-drink tax was enacted in 1994 and is estimated to generate $19 million in revenue for the School District in fiscal years 1996 and 1997. The City generates additional revenue for the School District pursuant to the voluntary contributions program instituted by executive order of the Mayor in 1994 to collect voluntary payments in lieu of taxes from Philadelphia nonprofit institutions owning exempt real estate in the City. This program generates approximately $3.5 million per year for the School District. The City also provided school crossing guards at an annual cost of approximately $11.7 million per year; it contributed $3.4 million in capital funds to construct a high school for the creative and performing arts; it provided other services and/or assistance to the School District; and it contemplates a sale of tax liens in an effort to generate additional funds.

26. The City's expert witness established that a 1 percentage point increase in the City's property tax rate, average business tax rate and wage tax rate would result in a 21.2 percent reduction in the currently estimated market value of property per resident, 31.9 percent reduction in the currently estimated business tax base per resident and a 2 percent reduction in the current employment base of 687,055 jobs.

27. The $127 million proposed cuts by the Governor in medical assistance to welfare recipients will have a devastating impact upon recipients residing in the City, as well as the City and public school children adversely affected by the Governor's actions. According to the Mayor's Chief of Staff, the Commonwealth budget enacted for fiscal year 1997 presents a direct adverse impact on the City in excess of $400 million associated with the medical assistance and other cuts and will have a negative affect on the health, safety and welfare of City residents.[5]

*Commonwealth of Pennsylvania*

28. The Commonwealth made an additional allocation of $13.2 million to the School District for its 1996–1997 fiscal year. The School District will use this additional allocation to fund proposed cuts in its desegregation spending, early childhood programs and

5. Record support for the foregoing findings includes, inter alia, CP Exs. 3A, 3B, 3C, 4, 5, 7A, 7B, 8B, 9, 10, 13, 14, 16, 19, 22, 24, 27, 29, 30, 30A, 31A, 31B, 44, 48, 106; ASP Ex. 28; Tr. pp. 165–167, 2271–2275, 3833–3860, 3873, 3874–3875, 3879–3880, 3881–3882, 3893–3918, 3904– 3905, 3918, 3964–3965, 3973–3974, 3984–3985, 4011–4019, 4036–4040, 4121–4122, 4140–4141, 4247, 4328, 4407–4410, 4468–4474, 4505–4506, 4565–4571, 4575–4591, 4609–4623, 4624–4625, 4646.

expansion of full-day kindergarten to the remaining schools by September 1996.

29. Commonwealth records show that the number of children in the School District from AFDC families increased during the period 1992–1993 to 1996–1997 from 87,087 to 98,963, or 13.64 percent. For the same period, children from AFDC families in all other school districts in the Commonwealth declined from 132,943 to 125,107, or 5.89 percent. An expert witness for the Commonwealth and Governor agreed that a school district faces a greater educational challenge and costs in educating children from poor families and that this circumstance applies to Philadelphia.

30. Commonwealth funding of the School District for basic education and all other purposes has declined over the past five years, despite the increase in students living in poverty, increase in enrollment and decline in the ability of the local tax base to fund the School District. Commonwealth records show that for the period 1992–1993 to 1996–1997, the Commonwealth's basic education subsidy to the School District increased by 8.59 percent while the subsidy increased for all other school districts by 14.61 percent.

31. The Commonwealth's total appropriation for education increased 13 percent statewide from 1991–1992 to 1995–96; total appropriations for Philadelphia increased by 8 percent. For the period 1992–1993 to 1995–1996, the Commonwealth's total payments to the School District increased by 15.19 percent while total payments to all other school districts increased by 23.68 percent. Based upon the weighted average daily membership (enrollment measure used to calculate subsidies), the Commonwealth's total payments to the School District increased by 8.43 percent and for the remainder of the Commonwealth by 18.53 percent.

32. The Commonwealth's proposed budget for 1996–1997 provided for no increase in educational funds to the School District, even though student enrollment for next year is projected at 215,500 compared to the 1995–1996 student enrollment of 211,000. Com-

monwealth funding for 1996–1997 increased by 1.4 percent over the previous year, and this amount reflects a rate that is less than the current rate of inflation.

33. The Commonwealth and Governor control the operations of the School District through the Public School Code. The Commonwealth's State Board of Education and its Department of Education are delegated authority by the Commonwealth to measure the adequacy and efficiency of educational programs offered by public schools within the Commonwealth for purposes of evaluation of their educational performance.

34. Witnesses for the Commonwealth and Governor did not provide any evidence to show that a particular educational program was unnecessary as educationally unsound, although the Commonwealth established that the School District's $3.7 million cost projection for bilingual education was not relevant to this case. Their challenge was to the competency of School District documentation and support basis for the assumptions and to the methodologies applied by the School District and whether the cost projections were properly calculated.

35. An expert witness for the Commonwealth and Governor supported the use of comparative data in analyzing the reasonableness of expenditures and stated that comparative data would be useful when analyzing the efficiency of a school district's operations.

36. An expert witness for the Commonwealth and Governor stated that there is no formalized standard that applies to accountants in conducting an evaluation such as that conducted for the Commonwealth in this case. The School District was not informed either orally or in writing that any particular evaluation standard would be applied.

37. An expert witness for the Commonwealth and Governor testified that the School District can potentially save in excess of $31–50 million annually after implementing cost savings recommended by the Management and Productivity Task Force as quantified.

The Commonwealth proposed other cost savings, assuming changes in labor contracts and state law, in connection with the studies conducted by Coopers & Lybrand and the Hay Group.

38. An expert witness for the Commonwealth and Governor recommended that the Court designate an independent body such as the Pennsylvania Economy League to monitor the School District's implementation of the Management and Productivity Task Force recommendations to assure that the initiatives are aggressively pursued by the School District.

39. The Court does not credit the testimony of Commonwealth expert witness Creamer that none of the $133 million cost projections made by the School District were adequately supported or documented by the record. The Commonwealth and Governor did establish that cost projections for certain programs were inflated and/or redundant and that, at a minimum, some of the cost projections should be adjusted accordingly.[6]

### Cost Projections/Court Mandates

40. School District cost projections for complying with the Court's remedial order are found in SD Ex. 6 and total $133 million, exclusive of full costs yet to be determined for reduction in class sizes and other mandated programs. In its proposed findings of fact and conclusions of law, the School District states that its $133 million claim is reduced to $77.3 million for 1996–1997 because some of the costs included in the original claim are included in the School Board's approved budget.

41. The $77.3 million claim is offset by the receipt of additional revenue from the Commonwealth, additional local tax revenue and administrative reductions totalling $19 million, for a net result of $58.3 million. In addition to this cost projection, the School District claims $25 million to implement a school repair and maintenance program, $13.9 million to begin class size reductions for grades one and two and $23 million to restore school-based cuts. The total cost projection for 1996–1997 is approximately $120.2 million.

42. In its submission to the Court on July 29, 1996, the School District requested funds for remedial desegregation programs for 1996–1997 for the following: parental involvement, professional development, teaching and learning networks, reduced class sizes, community schools, school-to-career/expansion of magnet programs and small learning communities, Quest schools, facilities repair and maintenance and the net amount of school-based cuts for 1996–1997 of $20 million.

43. In calculating the projected costs for mandated programs, the School District's financial staff made assumptions using various factors including, among others, employee benefits, inflation rates, increase in teacher hiring due to enrollment trends and salary increases. The assumptions were explained in meetings with representatives of Arthur Andersen, and the assumptions are used in preparing School District budgets submitted to the School Board, City Council and bond rating agencies.

44. The School District's cost estimates, contained in SD Ex. 6, were in part adequately supported and proven by the evidence. Supporting documentation provided to the Commonwealth's expert consultants and offered at trial was admitted at SD Exs. 22(a)–(nnn), C Exs. 269, 270 and other material that was exchanged during discovery.

\* \* \*

45. School District cost projection for complying with Court mandates to increase **parental involvement** is $1,617,400 for 1996–1997. Plans call for 11–month schedules for principals to facilitate early school registra-

---

6. Record support for the foregoing findings includes, inter alia, C Exs. 90, 234, 263, 264, 265; SD Exs. 1, 10; CP Ex. 107; ASP Exs. 2, 2A; Tr. pp. 1263, 2578–2579, 2691–2696, 2833–2837, 2851–2853, 2963–2964, 3021–3030, 3037–3041, 3124–3125, 3177–3189, 3206–3207, 3214–3215, 3225–3229, 3302–3305, 3309; Stipulation of Counsel, July 22, 1996; and relevant references in n4, supra.

tion, staff and parent training during the summer and installation of telephones in schools for increased parent/teacher communication. The cost projection was adequately supported and proven by the record. Although this cost projection is accepted by the Court, the School District is not relieved of the obligation to implement parental involvement plans developed in cooperation with the parents' groups identified in the Court's April 26, 1996 opinion and order.

46. School District cost projection for **professional development** for 1996–1997 is $25.1 million, although approximately $5 million is funded in the adopted budget. This projection is based upon an assumption that professional development must be compensated at an extracurricular rate of $27.73 per hour, although this rate is not required. The Strawberry Mansion cluster leader pays the staff development rate of $20.48 per hour. Although the description for professional development responds in part to the remedial order, the total cost projection was not adequately supported or proven. At a minimum, the cost projection shall be adjusted based on the difference between using a staff development rate and extracurricular rate, or $6.5 million, and another $1.06 million due to redundancy with the parental involvement estimate. A separate estimate was not presented for professional development leadership time. This cost projection is contingent upon proposed changes in state law.

47. School District cost projection for the **teaching and learning network** for 1996–1997 is $8 million. This network is designed to implement the integration of academic standards, not yet fully developed, throughout the School District along with the professional development of teaching staff. The program is responsive to the remedial order. The cost projection shall be decreased by $1.8 million due to mathematical error but was otherwise adequately supported and proven.

48. School District cost projection to implement **class size reductions** in grades one and two during 1996–1997 is $13.9 million. This program description responds to the remedial order to commence reduction in all class sizes beginning with grades K–3. The cost projection was adequately supported and proven by the record.

49. School District cost projection to initiate **family resource networks,** under the community school concept, for 1996–1997 is $6.1 million. As described, this program responds to the remedial order for the School District to resolve the drastic school attendance problems and to reduce school dropout rates. The Strawberry Mansion cluster operated eight community schools at least two days per week and remained open an additional three hours each day, offering a variety of student and parent support services and programs. The cost projection was adequately supported and proven by the record.

50. School District cost projection to provide **three hours of extra instruction** per week for the most at-risk students in 1996–1997 is $11,004,900. The School District's financial planning witness stated to the Commonwealth's expert witness that the cost projection was a very rough approximation and that this program would be given some serious thought if funds were received. The cost projection for **extended use of school buildings an extra three hours** per day for 180 days in 1996–1997 in 257 schools is $10,479,400. Neither the School District's financial planning witness nor other witnesses could adequately support this cost projection. It is apparent that no substantive planning has yet taken place in these categories, and the cost projections therefore cannot be sustained.

51. School District cost projection for the **school-to-career program** for 1996–1997 is $800,000. This program responds to the remedial order, and the cost projection was adequately supported and proven by the record.

52. School District cost projection for creating **small learning communities** for 1996–1997 is $9,411,800. Based on testimony by the School District's financial planning witness, this cost projection was not adequately supported or proven.

53. School District cost projections for 1996–1997 for **full-day kindergarten, early leveling, books, instructional materials, computers and accommodation room capacity** are adequately supported and proven by the record. These programs respond to the remedial order, and the cost projections are fully funded for 1996–1997. The remainder of school-based cuts must be restored to the schools because they affect programs that respond to the remedial order or impact upon racially isolated schools.

54. School District total cost projection to pay **teacher rewards** for improving the academic achievement of their students is $137 million, beginning in 1997–1998 through 1999–2000. This projected expenditure has not been adequately supported and was previously rejected by the Court. No other teacher accountability program has been offered by the School District.

55. The total future cost projection for 1997–1998 through 1999–2000 is approximately $870 million and includes the cost projection for teacher rewards. These costs are under further study and modification, and future cost projections depend largely upon revenue levels, changes in state law and cost savings generated through management and productivity initiatives. The estimates for future years' fiscal needs, if any, shall be determined prior to the School District's adoption of its operating budget according to this opinion and order.

56. The remedial order requires maintenance and repair of School District building facilities, giving priority to racially isolated schools, which are the oldest and, generally, in the worst condition. Because the facilities audit ordered by the Court and School District planning for the facilities maintenance program will require additional time to implement in full and some of the maintenance costs are in any event charged to the capital budget, no cost projection for this item can be determined for 1996–1997.

57. In arriving at a determination, the Court has taken into account the additional revenue and cost savings totalling $19 million received by the School District since the adoption of its operating budget. Because of the lack of adequate funds to comply with the remedial order, the School District is entitled to additional resources for 1996–1997 of **$45.1 million.**[7]

## II.

## CONCLUSIONS OF LAW

1. Article III, § 14 of the PA Constitution provides that the Commonwealth is required to maintain and support a "thorough and efficient" system of public education to serve the needs of the Commonwealth. Pursuant to the PA Constitution, Article IV, the Governor is required to recommend educational spending to the General Assembly, approve appropriations and supervise the executive departments of government such as the Department of Education.

2. The City of Philadelphia is a home rule municipality and is the only first-class city within the Commonwealth. The City conducts its affairs pursuant to the Philadelphia Home Rule Charter, 351 Pa.Code §§ 1.1–100—12.12–503, authorized by the First Class City Home Rule Act, Act of April 21, 1949, P.L. 665, *as amended,* 53 P.S. §§ 13101—13157.

3. The School District was established by an act of the General Assembly. Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§ 1–101—27–2702. It operates as an independent home rule school district under the First Class

---

7. Record support for the foregoing findings includes, inter alia, SD Exs. 1, 6, 22, 23, 51; C Exs. 234, 263, 264; Tr. pp. 217–235, 257, 281, 282–284, 304–314, 421, 440–448, 501–505, 560–562, 570–575, 582–587, 646–647, 680–681, 702–704, 715–732, 734–737, 738, 750–758, 765–767, 796–799, 801–807, 925–927, 935, 1009–1010, 1011–1018, 1050–1063, 1089, 1095–1096, 1118, 1133–1135, 1158–1161, 1145–1156, 1260–1264, 1382–1384, 1705–1710, 1716–1717, 2001–2004, 2331–2335, 2357–2362, 2473–2488, 2506–2519, 2607–2615, 2647–2651, 2660–2677, 2708, 2750–2753, 2781–2784, 2875–2883, 2931–2934, 2990–2992, 3634–3638, 3743–3747, 3774.

**1380**

City Public Education Home Rule Act, Act of August 9, 1963, P.L. 643, *as amended,* 53 P.S. §§ 13201—13223. The School District acts as an agent of the Commonwealth for the sole purpose of administering its constitutional obligation to maintain and support a thorough and efficient system of public education in the City of Philadelphia.

■ 4. Under the PA Constitution, public education is a fundamental right, defined also as a civil right that may not be denied to any person on the basis of race within the Commonwealth. PA Constitution, Article I, § 26. *See also* Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §§ 951—963.

5. The School District is a political subdivision created by the General Assembly for the sole purpose of administering the Commonwealth's constitutional obligation to provide a thorough and efficient system of public education.

6. Traditional agency principles have been applied by the courts in interpreting and defining the relationship between a school district and the Commonwealth, and as an agent of the Commonwealth, the School District acts on behalf of the Commonwealth.

7. The Commonwealth has direct control over the activities of the School District by virtue of its system of laws enacted under the Public School Code of 1949; authority vested in the State Board of Education, which enacts and implements regulations governing the operation and affairs of school districts statewide; authority conferred in the Department of Education to monitor and administer the public educational affairs of the Commonwealth; and other vested powers and authority to control School District activities.

■ 8. The burden is on the School District and ASPIRA to demonstrate that the School District requires additional funds to comply with the remedial order, and to satisfy that burden the School District and ASPIRA must show a legal duty on the part of the

Commonwealth, and as to ASPIRA on the part of the City, to provide the additional funds needed.

■ 9. The Commonwealth has the burden to prove its cross-claim against the City and to show that it has a legal duty to fund the Commonwealth's constitutional obligation to maintain and support a thorough and efficient system of public education.

10. The School District has met its burden to show that it requires additional resources from the Commonwealth to fulfill, on behalf of the Commonwealth, the constitutional requirement and responsibility to maintain and support a system of public education on equal terms to all public school children.

11. As the principal and primary government unit responsible for carrying out this constitutional mandate, the Commonwealth is legally and equitably obligated to provide adequate resources to its agent, the School District, to carry out its delegated responsibility.

12. The Commonwealth is not absolved of its primary obligation to maintain and support a thorough and efficient system of public education simply because the School District has been delegated the responsibility to carry out day-to-day educational activities associated with the Commonwealth's obligation.

13. ASPIRA has failed to sustain the burden imposed upon it to prove the claim asserted against the City. If ASPIRA's claim fails, judgment must be entered in favor of the City, and the Commonwealth's cross-claim fails as a matter of law.

14. The Commonwealth has been on notice of efforts by the Human Relations Commission to enforce its order and of the court enforcement proceedings by virtue of the involvement by the Department of Education in reviewing and approving the School District's proposed desegregation plans. The School District has sought to join the Commonwealth for funding purposes for more than twenty years.

15. The PICA Act was enacted to provide cities of the first class the legal tools necessary to enable such cities to eliminate budget deficits that prohibit them from performing essential municipal services, to enable first-class cities to access capital markets in order to avoid default and chronic cash shortages and to promote sound financial planning and budgetary practices to address the underlying problems that caused the deficit. The General Assembly declared, among other things, that the inability of a city of the first class to provide essential services to its citizens adversely affects the health, safety and welfare of all citizens of this Commonwealth.

16. The denial of equal educational opportunity to thousands of public school children in Philadelphia will have immeasurable adverse impacts on the citizens of the entire Commonwealth. Such impacts were graphically described by the legislature in its statement of public policy considerations that prompted the legislature to enact the Commonwealth's Human Relations Act.

■ 17. The Commonwealth and Governor are not immune from suit instituted to compel the performance of a mandatory duty, and the School District and ASPIRA have no other available state remedy to enforce their claims.

18. Desegregation is interpreted as the provision of equal educational opportunity to the victims of de facto or de jure segregation, and remedies imposed by courts to cure the consequences of racial segregation may vary from case to case depending upon the circumstances and the extent of harm suffered by the children adversely affected.

## III.

## DISCUSSION

### A.

The Pennsylvania Supreme Court recently reiterated some of the principles that govern the courts in deciding issues affecting the right of public school children to an education. In *School Dist. of Wilkinsburg v. Wilkinsburg Education Ass'n,* 542 Pa. 335, 667 A.2d 5 (1995), the Court very clearly stated:

> First, public education in Pennsylvania is a fundamental right. It is required by Article III, Section 14 of the Pennsylvania Constitution. Second, this court has consistently examined problems related to schools in the context of that fundamental right. In *School District of Philadelphia v. Twer,* 498 Pa. 429, 435, 447 A.2d 222, 224–25 (1982), for example, Mr. Justice Nix, now Chief Justice, wrote:
>
>> [T]he maintenance of a public school system is primarily for the education and training of our youth and the incidental financial benefit of those participating therein is of secondary concern.... *The polestar in any decision requiring the assignment of priorities of resources available for education must be the best interest of the student....* [A]ny interpretation of legislative pronouncements relating to the public educational system must be reviewed in context with the General Assembly's responsibility to provide for a "thorough and efficient system" for the benefit of our youth.
>
> (Citations omitted). In sum, on remand, the best interest of the children is the polestar.

*Wilkinsburg Education Ass'n,* 542 Pa. at 343, 667 A.2d at 9 (emphasis added).

Other considerations for courts to apply were initially stated in the seminal case in Pennsylvania on school desegregation law, *Pennsylvania Human Relations Commission v. Chester School Dist.,* 427 Pa. 157, 233 A.2d 290 (1967). After reviewing the legislative history leading up to enactment of the Human Relations Act, the Supreme Court commented on the significance of the 1961 amendments to the Human Relations Act. In particular, the Court noted the legislative amendment to Section 2, 43 P.S. § 952, that specifically refers to the evils emanating from racial segregation in public schools within this Commonwealth.

■ As quoted in *Chester School Dist.*, Section 2(a) of the Human Relations Act, 43 P.S. § 952(a), stated:

The practice or policy of discrimination against individuals or groups by reason of their race, color, religious creed, ancestry, age or national origin is a matter of concern of the Commonwealth. Such discrimination foments domestic strife and unrest, threatens the rights and privileges of the inhabitants of the Commonwealth, and undermines the foundations of a free democratic state. *The denial of equal employment, housing and public accommodation opportunities because of such discrimination, and the consequent failure to utilize the productive capacities of individuals to their fullest extent, deprives large segments of the population of the Commonwealth of earnings necessary to maintain decent standards of living, necessitates their resort to public relief and intensifies group conflicts, thereby resulting in grave injury to the public health and welfare, compels many individuals to live in dwellings which are substandard, unhealthful and overcrowded, resulting in racial segregation in public schools and other community facilities, juvenile delinquency and other evils, thereby threatening the peace, health, safety and general welfare of the Commonwealth and its inhabitants.*

*Chester School Dist.*, 427 Pa. at 168–169, 233 A.2d at 296 (emphasis added). Public schools are places of public accommodation. Section 4(*l*) of the Human Relations Act, 43 P.S. § 954(*l*). An equal educational opportunity is a civil right enforceable by the Commission. Section 3, 43 P.S. § 953.

The highest court of this nation laid the foundation for legislative, executive and judicial branches of state government to follow. In *Brown v. Board of Education of Topeka (Brown I)*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), Chief Justice Earl Warren expressed doubt that "any child may reasonably be expected to succeed in life if he [or she] is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Id.*, 347 U.S. at 493, 74 S.Ct. at 691. This principle is embodied in Article I, § 26 of the PA Constitution and in the Human Relations Act, which prohibit the denial of civil rights to any person on the basis of race.

In *Pennsylvania Human Relations Commission v. Uniontown Area School Dist.*, 455 Pa. 52, 313 A.2d 156 (1973), the Supreme Court held that the legislature guaranteed in the Human Relations Act an "equal educational opportunity" for all school children of this Commonwealth. In *Rankin v. School Dist. of Pittsburgh*, 33 Pa.Cmwlth. 129, 136–137, 381 A.2d 195, 199 (1977), this Court stated:

In testing the appropriateness of judicial remedies with respect to the myriad and complex problems of school desegregation we are guided by the Supreme Court's rule in *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) that "the nature of the violation determines the scope of the remedy."

### B.

The Pennsylvania Supreme Court in *Wilson v. School Dist. of Philadelphia*, 328 Pa. 225, 195 A. 90 (1937), held that a school district exists solely as an agent of the Commonwealth and is created for the purpose of administering the Commonwealth's system of public education. In *Pennsylvania Federation of Teachers v. School Dist. of Philadelphia*, 506 Pa. 196, 484 A.2d 751 (1984), the Supreme Court held that the School District, created by the General Assembly, is an agent of the Commonwealth delegated with authority to administer the Commonwealth's obligation under Article III, § 14 of the PA Constitution.

■ In interpreting the relationship between school districts and the Commonwealth, courts have applied ordinary agency principles. In Pennsylvania, a principal is liable for the acts and conduct of its agent, even where the principal neither caused nor participated in the agent's acts or conduct.

*Aiello v. Ed Saxe Real Estate, Inc.,* 508 Pa. 553, 499 A.2d 282 (1985). The Commonwealth has the right and authority to control the School District, and the School District is subject to the will of the legislature. *Pennsylvania Human Relations Commission v. St. Joe Minerals Corp.,* 476 Pa. 302, 382 A.2d 731 (1978); *Slippery Rock Area Joint School System v. Franklin Township School Dist.,* 389 Pa. 435, 133 A.2d 848 (1957); *Smith v. Darby School Dist.,* 388 Pa. 301, 130 A.2d 661 (1957). Finally, under the Human Relations Act, a principal is liable for the acts of its agent. *County of Allegheny v. Wilcox,* 76 Pa.Cmwlth. 584, 465 A.2d 47 (1983), *appeal dismissed,* 507 Pa. 66, 488 A.2d 277 (1985).

 Article III, § 14 of the PA Constitution provides that:

> *The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth.* (Emphasis added.)

Where the Commonwealth has delegated a particular obligation to one of its political subdivisions and the political subdivision proves that its resources are inadequate to carry out its functions, the Commonwealth is obligated to adequately fund the political subdivision to satisfy its legally delegated obligations. *County of Allegheny v. Commonwealth,* 507 Pa. 360, 490 A.2d 402 (1985).

In *County of Allegheny v. Commonwealth,* the county filed suit against the Commonwealth on the basis that the county lacked adequate resources to perform its delegated functions on behalf of the Commonwealth in maintaining prisoners. The Supreme Court reversed the common pleas court order that sustained the Commonwealth's preliminary objections, and in doing so, the Supreme Court held the following:

> [I]t is the State's obligation to maintain order and to preserve the safety and welfare of all citizens. That responsibility requires the governmental unit to provide adequate and secure facilities for the housing of those individuals who have demon-

strated by their conduct that they pose a danger to the other members of society. The sovereign governmental power is reposed in the state. Although it is entirely proper and indeed customary for the state to delegate a portion of that obligation among its political subdivisions, such delegation of responsibility does not relieve the state of its primary duty to assure the satisfactory discharge of the obligation.

> Proceeding from the premise that the State bears the primary responsibility and that *the State must provide the political subdivision with the taxing power, or the appropriations, necessary to discharge its statutorily delegated duty to provide detention facilities,* the exercise of the discretion of a state official in refusing a request to provide alternative custodial facilities must be measured against the adequacy of the resources made available to the political subdivision to meet this need.... Rather, where the political subdivision can demonstrate that its resources for these purposes are clearly inadequate, it is the responsibility of the State to either provide additional facilities or to allocate to the political subdivision reasonable funds to discharge its delegated responsibility. Such relief is properly accorded in an action sounding in mandamus....

*Id.,* 507 Pa. at 376–378, 490 A.2d at 410–411 (citations omitted) (emphasis added).

The Supreme Court's holding in *County of Allegheny v. Commonwealth* is equally applicable here, where the political subdivision has demonstrated that its resources are inadequate to meet Court mandates in the discharge of its delegated function and where the political subdivision lacks the power to tax. The question of the adequacy of School District resources was raised in this case as early as 1972 when this Court, in a decision affirmed by the Supreme Court, stated that this issue would not be considered until the School District submitted a minimum acceptable plan for remedying the de facto segregation within the School District. *School Dist. of Philadelphia v. Pennsylvania Human Relations Commission (HRC I),* 6 Pa.Cmwlth.

281, 294 A.2d 410 (1972), *aff'd*, 455 Pa. 52, 313 A.2d 156 (1973); *see also Pennsylvania Human Relations Commission v. School Dist. of Philadelphia (HRC III)*, 30 Pa.Cmwlth. 644, 374 A.2d 1014 (1977), *aff'd*, 480 Pa. 398, 390 A.2d 1238 (1978).

### C.

In their brief in support of the proposed findings and conclusions, the Commonwealth and Governor do not respond to the Supreme Court's decision in *County of Allegheny v. Commonwealth*. Instead, they argue that the School District did not prepare its budget to first incorporate costs associated with Court mandates and then to allocate the remainder to other expenses; the School District failed to seek authority from City Council to levy additional taxes to balance the School District's budget; various programs for which the School District has sought funding were not required by the remedial order; the School District's cost projections are indefensible; and the School District through cost savings has the capacity to fund Court mandates. The Commonwealth and Governor, in the alternative, assert that the City has the obligation to fund the maintenance and support of a thorough and efficient system of public education in Philadelphia.

■ The Commonwealth and Governor argue that the Court should bar recovery by the School District because it failed to prepare a budget that initially applied existing funds to meet Court mandates and then allocated any remaining funds to other expenses, in accordance with the holding in *Evans v. Buchanan*, 582 F.2d 750 (3d Cir.1978), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). The Commonwealth and Governor maintain that other educational programs should be reduced where necessary to fund Court mandates. In *Evans v. Buchanan*, the court recognized that where no funds exist or insufficient funds are available to operate the remainder of the school system after first applying the funds to court desegregation mandates, such circumstance could ultimately result in the disruption or interference with court mandates. Although the Third Circuit stated that a school district could curtail certain programs that fall outside the penumbra of those mandated under the desegregation order, the illustration used by the court related to extracurricular programs.

The School District must comply with the Public School Code; it must comply with collective bargaining agreements with unionized employees; and it must comply with other federal, state and local mandates. Moreover, the Commonwealth's argument that the School District failed to prove that budgetary cuts in non-mandated programs would threaten School District operations is not demonstrated by this record. On the other hand, there was no evidence adduced by the Commonwealth and Governor to demonstrate that the School District had adequate funds to meet Court mandates along with all other statutory and contractual obligations.

■ The Court likewise rejects arguments that the Philadelphia Home Rule Charter imposes a mandatory duty upon the School District to request authority to levy taxes to balance its budget. The School District made its presentation to City Council and requested funding to balance its budget for the 1996–1997 fiscal year. The School District informed City Council that it did not seek funding or a tax increase to cover a projected $148 million deficit, and justifiably so because the School District made various downward adjustments to this sum, and, in any event, requests for a tax increase would have been futile given the already high tax burdens of the City. The Court finds no violation of the Home Rule Charter; nor does the Court find any "collusion," as claimed by the Commonwealth and Governor, by virtue of the funding protocol followed by City Council and the School District.

In *School Dist. of Philadelphia v. Council of the City of Philadelphia*, 129 Pa.Cmwlth. 503, 566 A.2d 352 (1989), *appeal denied sub nom. Gibson v. School Dist. of Philadelphia, Board of Education*, 525 Pa. 660, 582 A.2d

326 (1990), cited by the Commonwealth and Governor, this Court decided whether the School Board may create a surplus to offset anticipated out-year deficits by eliminating six currently operated day-care programs and instead diverting the funds earmarked for the programs. In granting mandamus, this Court held that the budget must be spent as authorized and that since the programs were included in the budget, the School Board's actions were illegal. This case offers no support for the position taken by the Commonwealth and Governor.

■ Next, the Commonwealth and Governor contend that the Court should bar recovery to the School District because it has not segregated the remedial costs associated solely with racially isolated schools. None of the courts of this Commonwealth has held in school desegregation cases that a desegregation plan may not and should not affect an entire school district. Moreover, the Court's remedial order directs a remedy that necessarily impacts upon the entire system, but in particular circumstances requires priority emphasis on racially isolated schools. In fact, the Commission's recommended elements for a school desegregation plan contemplated that any such plan may indeed cover a school district system-wide. *Pennsylvania Human Relations Commission v. Norristown Area School Dist.*, 20 Pa. Cmwlth. 555, 342 A.2d 464 (1975), *aff'd*, 473 Pa. 334, 374 A.2d 671 (1977). *Also see Pennsylvania Human Relations Commission v. School Dist. of Philadelphia (HRC IV)*, 66 Pa.Cmwlth. 154, 443 A.2d 1343 (1982) (court approved system-wide school magnet program).

■ Other cases cited by the Commonwealth and Governor are distinguishable and provide no support for their argument that the Court should bar recovery to the School District. In *Milliken v. Bradley (Milliken II)*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), the U.S. Supreme Court affirmed the district court's order, upon remand, for a desegregation plan that included pupil reassignment along with other remedial educational components in the areas of reading programs, in-service training for all teachers and administrators, fair testing of minority students and counselling and career guidance. The Supreme Court confirmed in *Milliken II* that other independent remedial relief may be necessary to remedy the consequences of segregation and that relief may, in fact, impact upon an entire school system.[8] The rule was established that in fashioning a desegregation order, courts shall be guided by equitable principles and may consider remedial programs that are designed to cure the effects of segregation. *Chester School Dist.*[9]

In *Evans v. Buchanan* a pupil assignment plan was ordered along with other ancillary relief, including in-service training of all staff, a reading and communications

---

**8.** The district court's prior interdistrict desegregation order referred to in *Milliken II* was reversed because it exceeded the constitutional violation. An interdistrict or metropolitan desegregation plan was previously rejected by Commonwealth Court in the case sub judice. The Commonwealth and Governor's reliance upon *Missouri v. Jenkins*, ── U.S. ──, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995), and *Liddell v. Board of Education*, 771 F.Supp. 1503 (E.D.Mo. 1991), likewise offers no support for their position. In *Missouri v. Jenkins*, the Supreme Court held that the district court order for salary increases to 5000 Kansas City school district staff was "simply too far removed" from the purposes of remedying segregation and that on remand, the district court should consider that many of the court's goals for quality education have been met over the past seven years in determining whether the school district has attained unitary status. Of interest is the Supreme Court's comparison of the reverse costs per pupil spending between the KSMSD and neighboring school districts. In *Liddell v. Board of Education*, the City of St. Louis sought state funding for capital improvements that were not included in the district court's remedial order.

**9.** In other cases cited by the Commonwealth and Governor, *Magar v. Lifetime*, 187 Pa. Superior Ct. 143, 144 A.2d 747 (1958), and *Lichter v. Mellon–Stuart Co.*, 305 F.2d 216 (3d Cir.1962), the courts dealt with the burden of a plaintiff to provide proof showing specific allocations of damages in breach of contract actions. The School District's action is not one for damages for breach of contract.

program, re-design of school curriculum and a human relations program. The ordered relief affected entire school systems in Delaware that were included in the court's decree. The Third Circuit stated that in desegregation cases courts may order where appropriate ancillary relief or remedial educational programs pursuant to the rule that courts are to be guided by equitable principles. Finding support in the record for the reading and communication skills program, among others, the Third Circuit reiterated the notion that no educational component is more related to desegregation than reading and communication skills.

 Finally, the Commonwealth and Governor argue that the Court should reject the School District's cost projections in total because they are not adequately supported. As to the adequacy or sufficiency of cost estimates, this Court held in *Carroll by Burbank v. Philadelphia Housing Authority,* 168 Pa.Cmwlth. 275, 650 A.2d 1097 (1994), that a claim would be sustained where the plaintiff presented competent evidence from which a jury could reasonably determine the future consequences of a present injury and what the damages should be, citing *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 494 A.2d 1088 (1985). Further, a claim for damages may be sustained where the amount may be fairly estimated from the evidence; relief may not be denied solely because the amount of damages is difficult to ascertain with precision. *Id.*

 Moreover, the evidence is insufficient to prove the contention that the School District has the capacity to currently fund the remedial order through management and productivity cost savings as claimed. Extensive testimony was offered concerning the cuts in school-based funding, administrative expenses, deferral of educational programs and other cost savings and that the 1996–1997 operating budget already reflected the savings projected by the Management and Productivity Task Force.

### D.

 The Court does not accept *Ross v. Keitt,* 10 Pa.Cmwlth. 375, 308 A.2d 906 (1973), *aff'd,* 466 Pa. 576, 353 A.2d 841 (1976), as support for the Commonwealth and Governor's argument that the City has a duty to fund the remedial order. In *Ross* this Court affirmed the trial court's decision that the Commonwealth was not an indispensable party to the equity class action filed by students and their parents and citizens' groups. This Court noted that any decree by the trial court mandating that the School Board balance its budget and that City Council take necessary steps to fund the schools for a full year would affect the Commonwealth only in the sense that it would cause the local officials to perform the duty delegated by the General Assembly to maintain and support a thorough and efficient system of public education. This Court did not determine on the merits that it was the duty of the City to fund the public schools. In a concurring opinion, Judge Kramer made clear his belief that:

> [T]he ultimate responsibility for providing the constitutional mandate to establish and maintain a "thorough and efficient system of public education" rests squarely on the General Assembly of Pennsylvania, and not solely on this or any other school district. Although the General Assembly may delegate its duties, it may not absolve itself from the responsibility to fully perform a clear constitutional mandate, when its agent (i.e. school district) fails or is unable to perform.

*Id.,* 10 Pa.Cmwlth. at 381, 308 A.2d at 909.

The Commonwealth and Governor further maintain that because of its power to control the School District, the City is responsible for funding the remedial order. The City is authorized to establish the term, number and qualifications of School Board members, to provide procedures for their nomination and to provide mechanisms for their appointment or election. *See* Section 18(a)(3) of the First Class City Public Education Home Rule Act, 53 P.S. § 13218(a)(3). Under the Public Education Home Rule Act, the Mayor appoints nominees to the School Board, which is delegated the authority to administer, manage and operate the School District in accordance

with powers vested by the Public School Code. The legislature further provided the City with discretionary power to authorize the School Board to levy taxes necessary to fund School District operations.[10]

The legislature has delegated certain power to the City to determine School District structure; the Public Education Home Rule Act, on the other hand, limits this power and provides that the City would have no powers and authority any greater than those expressly or impliedly conferred by Section 18, 53 P.S. § 13218. *See also Schneck v. City of Philadelphia*, 34 Pa.Cmwlth. 96, 383 A.2d 227 (1978). The legislature specifically prohibited the City from assuming the debt of the School District or from regulating public education or its administration, except as to setting maximum tax rates. It is beyond dispute that the Commonwealth and Governor retain the ultimate power and authority over the administration and funding of the School District, irrespective of the legislature's delegation of limited authority to the City.

In *Danson v. Casey*, 484 Pa. 415, 399 A.2d 360 (1979), the Supreme Court noted the unique position of the School District due to the fact that it is the only school district in the Commonwealth that has no independent power to levy taxes. The *Danson* court dismissed the constitutional challenge asserted in that case to the state financing scheme because the plaintiffs did not allege a legal harm emanating from application of the financing scheme. In passing on the merits of the plaintiffs' complaint, the Supreme Court commented on the vulnerability of the School

District in terms of local taxation, which is dependent upon its power to politically persuade City Council to authorize necessary local taxes. *Danson v. Casey* does not support the Commonwealth and Governor's view that the City has the legal duty to fund the remedial order. Parenthetically, in *Allegheny County v. Commonwealth*, 517 Pa. 65, 534 A.2d 760 (1987), the Supreme Court noted a specific statutory requirement for the county to fund personnel for use of the courts within its judicial system.[11] *See* 42 Pa.C.S. §§ 3541, 3544 and 3721, *as amended*, and 3722. Neither the Commonwealth and Governor nor ASPIRA has shown a comparably explicit statutory requirement on the City.

■ Based upon an examination of the record, the Court concludes that ASPIRA has failed to satisfy its burden to prove that the City is liable for payment of additional funds to meet the remedial order. Assuming arguendo that a statutory requirement exists under the Home Rule Charter, the Public Education Home Rule Act or the Little Sterling Act, the City has sustained its burden to prove an incapacity or inability to provide additional resources to the School District to fund the remedial order. Correspondingly, the Commonwealth and Governor have failed to prove their cross-claim against the City. To show entitlement to contribution from the City, the Commonwealth and Governor must prove sufficient facts to sustain their cause of action against the City. *Mattia v. Sears Roebuck & Co.*, 366 Pa. Superior Ct. 504, 531 A.2d 789 (1987), *appeal denied*, 519 Pa. 660, 546 A.2d 622 (1988).

**10.** *See* the act commonly known as the Little Sterling Act, Act of August 9, 1963, P.L. 640, *as amended*, 53 P.S. §§ 16101—16103.3; the First Class City and School District Corporate Net Income Tax Act of 1969, Act of May 29, 1969, P.L. 47, 53 P.S. §§ 16111—16122; and the First Class School District Liquor Sales Tax Act of 1971, Act of June 10, 1971, P.L. 153, 53 P.S. §§ 16131–16140.

 In *Ryan v. City of Philadelphia*, 77 Pa.Cmwlth. 283, 465 A.2d 1092 (1983), the Court did not conclude, as contended, that the City is liable to provide funding to the School District. The sole issue was whether the City's funding of a school busing program violated the prohibition against

the City's regulation of public education. This Court held that the City merely performed a municipal function to provide safe passage for school children to and from school. Assuming that the City's actions were regulatory, they were merely a necessary incident of public education and did not violate the Public Education Home Rule Act. *Id.*

**11.** *See Pennsylvania State Ass'n of County Commissioners v. Commonwealth*, —— Pa. ——, 681 A.2d 699 (1996) (successor ruling by Supreme Court which held that the doctrine of separation of powers does not preclude judicial determination of state funding obligations).

■ The evidence proffered by the City demonstrated its fiscal inability to fund the remedial order, and, to the contrary, the Commonwealth and Governor failed to prove the Commonwealth's inability to fund the remedial order.[12] The City raised taxes 10 times on behalf of the School District during an 11–year period from 1980 through 1991. The City was near bankruptcy in 1991, and it took an act of the General Assembly to raise the City out of its financial abyss. After significant recovery efforts, the City enacted the liquor-by-the-drink tax authorized by the legislature in 1971. The fact that City witnesses did not testify that the City would transfer more real estate tax millage to the School District, make further discretionary grants, share wage taxes or challenge tax exempt status of public charities such as universities and health care providers fails to buttress the Commonwealth and Governor's claim.

## IV.

The Court concludes that the School District has sustained its burden to prove that its funding is inadequate to meet all of its obligations to comply with the remedial order. The Commonwealth and Governor have failed to sustain their burden to show that the School District possesses the capacity to comply with the remedial order or that existing funding levels are sufficient to enable the School District to comply. Therefore, judgment shall be entered in favor of the School District on its complaint against the Commonwealth and Governor to provide additional resources to the School District to pay costs associated with the remedial order. Judgment shall be entered in favor of the City and Mayor on the complaint filed by ASPIRA and on the cross-claim filed by the Commonwealth and Governor.

■ An expert consultant to the Commonwealth and Governor and the Chief of Staff to the Mayor recommended that an independent entity monitor the School District's implementation of the management and productivity initiatives and the expenditure of its funds. The Chief of Staff, in response to questioning by the Court, supported a process whereby the PICA Board would monitor and inspect the School District's fiscal and management activities much like the Board monitors the City's affairs to resolve its underlying fiscal and managerial problems. The Court agrees that independent monitoring is necessary. To the extent that the School District's fiscal affairs and operations affect the City's budget, the Court believes that a direction to the PICA Board to monitor and inspect the School District's fiscal and managerial affairs would be consistent with the current scope of the PICA Board's powers.

The existing PICA Board shall therefore be granted authority by the Court to monitor and inspect the School District's fiscal and management activities to assure its aggressive implementation of management and productivity initiatives and its proper expenditures of the public and private funds received. The Human Relations Commission shall continue to monitor the School District's compliance with the remedial order and the Human Relations Act. The PICA Board's authority and monitoring procedures shall be established prior to the release of any additional funds to the School District and in no event no more than thirty days

---

**12.** At the close of the evidence, the Commonwealth and Governor filed a motion for directed verdict. The Court may enter a directed verdict only where the evidence clearly and unambiguously supports judgment in favor of the moving party. *Thompson v. Maryland & Pennsylvania R.R. Preservation Soc.*, 417 Pa. Superior Ct. 216, 612 A.2d 450 (1992), *appeal denied*, 533 Pa. 635, 621 A.2d 581 (1993). The motion is denied based upon the record and ruling by the Court.

The Commonwealth and Governor also incorporate in their brief earlier preliminary objections to the third-party complaint and answer and new matter. The preliminary objections were previously overruled by the Court on April 30, 1996. The preliminary objections filed by the City and Mayor to the ASPIRA complaint and to the cross-claim are dismissed as moot.

The respective motions for compulsory nonsuit, deferred until the completion of all evidence, are likewise denied.

from the entry of judgment in this case. A conference shall be convened by the Court to effectuate this process. Beginning in 1997, the School District shall determine within sixty days prior to the adoption of its operating budget whether the School District has the fiscal capacity to fund costs to carry out the remedial programs for 1997–1998 and shall submit to the Commonwealth and Governor, and the other parties, a detailed statement of any additional sums required to meet the remedial order.

In conclusion, Article III, § 14 of the PA Constitution clearly imposes an obligation upon the Commonwealth to maintain and support a thorough and efficient system of public education; the Human Relations Act imposes an obligation on the Commonwealth to provide an equal educational opportunity to all public school children; and the Supreme Court has imposed an obligation on the Commonwealth to remedy the consequences of de facto segregation of public school children, despite the Commonwealth's claim of ignorance of the racially discriminatory conditions or of its lack of involvement in creating the conditions that exist. The time has come to put an end to this quarter-century-old case, but not at the further expense of the children who have suffered the most. The best interests of these children should be the guide. The Commonwealth and Governor, therefore, shall be held accountable for remedying the consequences of de facto segregation that exist in the Philadelphia public schools.

Jurisdiction will be retained by the Court.

## ORDER

NOW THEREFORE, this 20th day of August, 1996, the Court hereby orders as follows:

1. Judgment is entered in favor of the School District of Philadelphia and ASPIRA and against the Commonwealth of Pennsylvania and Governor of Pennsylvania.

2. Judgment is entered in favor of the City of Philadelphia and the Mayor of Philadelphia on the ASPIRA claim and on the cross-claim filed by the Commonwealth and Governor.

3. The Commonwealth and Governor shall submit a plan to the Court within thirty days from the date of this order detailing the means by which the Commonwealth will effectuate the transfer of additional funds payable to the School District to enable it to comply with the remedial order during fiscal year 1996–1997 and any future years during which the School District establishes its fiscal incapacity to fund the remedial programs.

4. The School District shall comply with all guidelines and mandates imposed upon it by the Pennsylvania Intergovernmental Cooperation Authority Board pursuant to the Pennsylvania Intergovernmental Cooperation Authority Act for Cities of the First Class, 53 P.S. §§ 12720.101—12720.709, in carrying out the Board's authority to monitor and inspect the fiscal and management activities of the School District.